**AUSTRIAN et al. v. WILLIAMS et al.**

United States District Court
S. D. N. Y.
Jan. 10, 1952.

Supplemental Opinion March 5, 1952.

Austrian & Lance, New York City (Carl J. Austrian, Saul J. Lance, George H. Schwartz, and Isadore H. Cohen, all of New York City, of counsel), for plaintiffs.

Milton Pollack and Sullivan & Cromwell, all of New York City (Milton Pollack, Arthur H. Dean, and Henry N. Ess, III, all of New York City, of counsel), for defendants Williams, Stone, Finney, Philipp and Pardee.

Sullivan & Cromwell, New York City (Edward H. Green, Arthur H. Dean, Milton Pollack, and Henry N. Ess, III, all of New York City, of counsel), for defendants Catchings, Dulles, Weinberg, Sachs and Bowers.

William Power Maloney, New York City (William P. Maloney, I. Alfred Levy, Bernard Weiss, and Max Dorff, all of New York City, of counsel), for defendants Niven, Mendes, Clowes, Wagner, Sr., Brown, Bechert, and Friedman.

LeBoeuf & Lamb, New York City (Horace R. Lamb, Craigh Leonard, and William H. Campbell, all of New York City, of counsel), for defendants Fogarty and Freeman.

Murray D. Welch, New York City (Murray D. Welch, Murray D. Welch, Jr., New York City, of counsel), for defendants McCornack, Johnson and Eccles.

McGuigan & Kilcullen, New York City (E. Gayle McGuigan, New York City, of counsel), for defendant Baker.

Markle & Pasternak, New York City (Harry J. Pasternak, New York City, of counsel), for defendant Jonas.

Cahill, Gordon, Zachry & Reindel, New York City (John T. Cahill, Charles F. Detmar, Jr. and Harold S. Glendening, all of New York, of counsel), for defendant Dillon.

Louis E. Kilmarx, pro se.

Roger S. Foster, General Counsel, and Aaron Levy, Washington, D. C., for Securities and Exchange Commission, amicus curiae.

WEINFELD, District Judge *.

This case involves the affairs of Central States Electric Corporation, an investment company organized under the laws of Virginia, with its principal place of business in Richmond, Virginia. On February 23, 1942, the Corporation filed in the United States District Court for the Eastern District of Virginia a petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., which was approved on February 27th, 1942. Messrs. Kent and Wilkinson were appointed trustees and when the latter resigned he was succeeded by Dennis.

Dennis and Kent conducted an investigation under Section 167 of the Bankruptcy Act and filed a report recommending that no suits be instituted against the officers, directors and the principal stockholder of Central States. The recommendation was approved by the District Court but upon appeal, the Court of Appeals, Fourth Circuit, reversed and directed a further investigation by disinterested trustees.[1] Thereafter, plaintiff Austrian was appointed a third trustee on November 15th, 1944. Messrs. Kent and Dennis resigned in March 1945 and the plaintiff Butcher was appointed as trustee. Austrian and Butcher have since acted as trustees. Following further investigation by them, under Section 167 of the Bankruptcy Act, Austrian and Butcher recommended that the present suit be filed and an order was entered by the District Court of Virginia authorizing them to bring this action. This suit was commenced on July 5th, 1945. Jurisdiction was sustained.[2]

---

* At the outset the Court desires to express to counsel representing the various parties deep appreciation for their earnest efforts in aid of the Court in the long and protracted trial of an unusually complicated case. Counsel conducted themselves with a high order of ability and ever readiness to assist the Court in clarifying the very involved questions of fact and vexing issues of law.

1. Committee for Holders, etc. v. Kent, 4th Cir., 143 F.2d 684.

2. Williams v. Austrian, 331 U.S. 642, 67 S. Ct. 1443, 91 L.Ed. 1718.

The broad charge made by the plaintiffs is that beginning in 1922 and continuing to the filing of the petition in reorganization in 1942, Harrison Williams, the majority stockholder of Central States, in collaboration with various defendants, engaged in a continuing plan to overreach and loot Central States. Conspiracy charges are included.

Plaintiffs attack a series of transactions as wrongs committed upon Central States by Williams and the defendants or some of them, charging that they overreached Central States in these transactions, converted, wasted, destroyed and wrongfully misappropriated and disposed of its assets, were guilty of breaches of trust, and grossly mismanaged its affairs.

The defendants fall into four categories: (1) Harrison Williams, principal and controlling stockholder of Central States, but not an officer or a director after 1922; (2) directors of Central States and of Williams' wholly owned companies who passed upon, or participated in, the transactions under attack; (3) directors or partners of other parties to the transactions who were not directors of Central States; and, (4) members of the debtor's accounting firm. Not all of the defendants are charged with dereliction in all of the transactions; some are involved in only one; others, in a number; the defendant Kilmarx in all but one; and Harrison Williams, in all.

To support the charges of misconduct, the plaintiffs set forth in their complaint thirteen transactions, "A" to "M" inclusive. In the "M" transaction they contend that Williams and a number of other defendants deliberately and fraudulently concealed and kept concealed the damaging facts of transactions "A" to "L" and so conducted themselves as to toll any applicable statute of limitations. At the end of the trial, transactions "F," "G" and "H" were dismissed for lack of proof. [3]

In addition to a denial of the charges, the principal defense is a plea of the statute of limitations.

One of the transactions under attack took place in March 1922, the second in 1927, all others except one in 1929, and one in 1938. Thus, the events under attack cover a span of sixteen years, making it desirable to review in broad outline Central States' history during that period.

Central States is an investment company whose holdings consisted primarily of stocks in public utility holding companies, which, in turn, held stock in both utility holding and operating companies. Its history falls roughly into four phases. The first began with its organization in 1912, when it acquired the majority of the stock of Cleveland Electric Illuminating Company, an operating utility company. It entered its second phase in 1922, when it relinquished its holdings in the Cleveland Electric Illuminating Company and acquired an interest in the North American Company, then engaged principally in investing in securities of public utility holding and operating companies.

During this second phase of Central States' history, which continued until late 1928, its principal interest was the investment in the North American Company of which it was the largest single stockholder. By August 1929, Central States owned directly 839,668 shares of North American common stock, 15% of the outstanding common stock, and an additional 10% indirect interest through other companies.

Central States' third phase, which began about September 1928, and continued until the late 1929 market crash, witnessed an era of expansion and of high optimism about electric utilities and their future. Central States increased its capital in September 1928 and again in June of 1929 by the sale of two series of convertible preferred stock.

During this third phase of its existence, Central States participated in the formation of affiliated and subsidiary corporations. These corporations, largely utility holding companies, although some held industrial securities as well, included Ameri-

**3.** As to the others, judgment was reserved following motions to dismiss made by the defendants both at the close of the plain-tiffs' case and at the close of the entire case.

can Cities Power and Light Corporation formed in October 1928; Electric Shareholdings Corporation organized in March 1929; Shenandoah Corporation formed in July 1929; and Blue Ridge Corporation formed in August 1929. The capital structure of these corporations consisted of preferred as well as common stock. Central States' investments in these corporations were principally in the common stock, following the pattern of what has been referred to as "leverage," which gives the equity owner the full benefit of increases in values but which operates adversely when the market goes down. [4] The leverage element with its potentiality for rapid gain during a rising market placed these common stocks in great demand during 1928 and 1929. During this period Central States' investments reached aggregate market values approximating $400,000,-000.

After the break in the market in 1929, the market value of the securities held by Central States diminished severely and Central States entered the fourth phase of its history. Its principal investments then were in North American Company, American Cities, Electric Shareholdings, Shenandoah and Blue Ridge. During the 1930s it disposed of a large part of its holdings in North American and in Electric Shareholdings, its entire interest in Shenandoah, and increased in 1938 its interest in, and acquired a majority of, Blue Ridge common stock. When Central States' petition for reorganization was filed in 1942, the market value of its assets had declined from a high of approximately $400,000,-000 in 1929 to $1,300,000.

Harrison Williams and Other Directors and Officers of Central States

Harrison Williams, the principal defendant in this action, had organized Central States in 1912 and throughout its history and up to the filing of the petition in reorganization, was intimately associated with the conduct of its affairs and the affairs of its affiliated corporations, and the top personnel of all of them.

Williams' activity in public utilities began in 1906, when he participated in the organization of the American Gas & Electric Company. Later, he was instrumental in the formation of other light and power companies. He was generally regarded as a person of dominance and prestige in the public utility field, and was credited with the growth and development of the North American Company.

Williams invested in the North American Company shortly after the first World War and was Chairman of its Board of Directors from 1920 to March 24th, 1922, when he resigned. He returned as Chairman of the Board in 1933, and holds that position today.

From March 24th, 1922 to 1942, Williams was neither a director nor officer of Central States. He had been a director and Chairman of the Board, but resigned on March 24th, 1922, the date of the earliest transaction under attack. His stock ownership in Central States and his general prestige and influence reflected his real interest and status.

When Williams organized Central States in 1912 he acquired 27½% of its common stock. At the end of 1922 he owned 64%, which was increased to 96% by the end of 1924, and to 97% in December 1928. Thereafter his stock ownership was reduced, so that in October 1929, it stood at 86% of the common stock, and in December 1929, largely as a result of transaction "J," at 62% of Central States' common stock. From 1930 and up to the date of the reorganization petition in 1942, he owned somewhat in excess of 50% of Central States' common stock at all times. [5]

During these years Williams also owned or controlled substantially all of the stock of a group of corporations formed by him

4. For discussion of Leverage see House Doc. No. 707, 75 Cong. Chapter II, pp. 28–29.

5. Certain preferred stock had voting rights. Williams owned some and the public held the balance, but the total amount outstanding was insignificant and did not materially affect voting control by the common stock.

for investment and other purposes, referred to hereafter as Williams' wholly owned or personal companies. The principal one of these was New Empire Corporation, all of whose stock was owned by him. Williams also owned or controlled, directly or through New Empire, Electric Investment Corporation, Federal Utilities, Inc., Utilities Securities Corporation and North American Securities Company, referred to hereinafter as Nasco. All of them had dealings with Central States.

The Board of Directors of Central States in 1929, when most of the transactions took place, was composed of Kilmarx, Fogarty, Freeman, Gruhl, Narlian, Schroeder, Glass, Dame (until May 28th) and Stone (from May 28th). Of all the directors who voted or participated in the transactions, recovery is sought principally against four: Freeman, Fogarty, Stone and Kilmarx. Although named as defendants jurisdiction was not acquired over the other directors due principally to service of process and venue problems [6] and in two instances because of death. [7]

New directors were elected to the Board from time to time between 1929 and 1942. Freeman, Fogarty and Stone resigned by the end of 1934, and of those who constituted the Board in 1929, Schroeder remained until 1937, and Kilmarx was still a director at the time of the trial. Commencing in 1935, a majority of the Board was composed of new directors. Of these, Johnson, McCornack, Eccles and Finney are included as defendants in the "E" transaction which occurred in 1938, and along with Baker and Pardee in the "M" transaction relating to the tolling of the statute of limitations.

Kilmarx first became associated with Central States in 1913 as a junior accountant. He managed Williams' personal affairs from 1913 to August 1931. He was Williams' confidential aid. He kept the books and records of Williams' privately owned corporations, paid his personal bills and had charge of his taxes. These func-

tions were taken over in 1931 by the defendant Johnson, but Kilmarx continued as director, and from 1934–1938 when the office of President was vacant he was Senior Vice President of Central States and performed the functions of president.

Stone's association with Central States began in June 1929 when he was elected a director. In July at Williams' instance, he was elected President, which office he held until 1934. He was also president of Blue Ridge and Shenandoah.

The defendants Freeman and Fogarty were elected directors of Central States on the invitation of Dame, a former president and a director of long standing of Central States and also president of North American. Freeman served as a director from 1928–1934. He had a broad business background as a partner in Touche, Niven & Co., Certified Public Accountants, and as president of a nationally known corporation. He had made investigations and financial analyses of various corporations for Williams. He had been associated with the North American Company since 1927 as an officer and director and is now its president. Fogarty was a director of Central States from 1926 until 1934 and his principal work was in financing and securities. He had been connected with the North American Company since 1902 and was its president from 1933 to 1939.

Kilmarx, Stone, Fogarty, Freeman and other Central States directors were also directors or officers of one or more Williams' wholly-owned companies which were parties to a number of transactions with Central States now under attack. Freeman was a director of one Williams' wholly-owned company; Fogarty of three; Stone was a director of three; and Kilmarx was a director of five, and is the only Central States director named in all transactions but one.

Of the directors named in the "M" transaction relating to the tolling of the statute of limitations, the principal defendant is Johnson, who was first employed by af-

---

6. Narlian, Schroeder and Glass. A number of directors in later years and named in other transactions are not included for similar reasons.

7. Dame and Gruhl died in 1933.

filiates of Central States in 1928 and became a director in 1937 and its president in 1938. Prior thereto, in March 1931, he had succeeded Kilmarx in the management of Williams' personal affairs and from 1931 to 1944 he was an officer and director of three William's personal companies.

## Management

Central States maintained an office in New York at 60 Broadway from which its main activities were conducted until 1931. Central States, its staff and officers, shared common space with Williams and his personally owned companies.

In 1923 Central States entered into a management contract with New Empire Corporation, the top company in the pyramid of the Williams' personal companies. This arrangement continued until the end of September 1929. Under its terms, New Empire supervised the operation and financing of the business of Central States, and made available "the advice, assistance and service of our entire organization" and "all services required other than such services as [Central States'] officers * * * may otherwise provide for." New Empire provided all necessary personnel, including officers as designated by the Board of Central States, paid their salaries and all other expenses save directors' fees. Specifically, with respect to officers, New Empire agreed to supply a president, vice-president, treasurer, secretary and such additional officers as might be elected by Central States' Board. Prior to election by Central States' Board of Directors the list of proposed officers would be submitted to Williams for his approval. New Empire also provided all employees, such as clerks, stenographers and operating personnel, offices and all data, records and reports for the keeping of the corporate books, and prepared complete reports of the "operation and management" of Central States.

Williams maintained a personal organization which administered his affairs and those of his privately owned companies. The services furnished by New Empire to Central States under the management contract were performed principally by members of this organization. The officers designated for Central States were employees, officers or directors of various of Williams' wholly-owned companies or otherwise closely associated with him or his interests. Upon their election as officers of Central States they continued to function in the Williams' companies or organization, and in some instances, for example, Kilmarx and later Johnson, continued to attend to Williams' personal affairs while holding office in Central States, New Empire or other affiliated Williams' companies.

## Domination

The plaintiffs' charges are pegged to a broad claim that Williams was more than just a controlling stockholder—that he dominated Central States in all of its affairs and operations.

Domination must be determined as a fact from all the circumstances, the action and conduct of Williams, of the officers and directors—and not from the mere ownership of controlling stock. Nor may a finding of domination be predicated solely on Williams' vigorous interest in the affairs and activities of Central States or because his views were considered by the directors. It was not unnatural that owning so vast a percentage of the shares outstanding, representing a value of many millions of dollars, Williams' views be ascertained and considered.

Upon all the evidence, the Court is convinced that Williams dominated and controlled Central States in all its affairs and operations. The management pattern appraised in the context of his controlling interest compels the conclusion that he was more than just a controlling stockholder. Williams not only had voting control but managerial control as well through New Empire, his wholly-owned corporation. The staff of the Williams' organization performed all the functions required by Central States. Central States had no personnel of its own. Williams, through New Empire, furnished all the officers of Central States. They were also in the employ of New Empire or the Williams' organization. Their salaries were paid by New Empire

or other Williams' companies. Thus, every man serving Central States as an officer was Williams' personal designee. Every director of Central States was elected by his votes.

Central States' business was conducted by an operating group composed of Narlian, Schroeder, Stone and Kilmarx, all closely identified with Williams in one or more of his enterprises. Each was a director or an officer of at least three or more of Williams' wholly-owned companies. Williams himself was considered by the others as a member of this management group. Although he was neither an officer nor director of Central States after March 1922 he continued to participate actively in its management and operation.

Every important action affecting Central States, including those in which his wholly owned companies were participants, was initiated by Williams or by directors or officers under his immediate supervision and instruction. In most of the transactions Williams, without prior consultation with Central States' directors, negotiated and determined on behalf of Central States the basic policy considerations underlying the program, following which the board members invariably gave their pro forma approval. Officers as well as directors carried out the administrative details which implemented the plan or program. He was looked to, as one of the directors described him, as "the real guide." Reports were made to him daily and constantly and even while abroad he was informed by cable as to major transactions.

Kilmarx, who was president of Central States up to July 1929, when he was succeeded by Stone, described Williams' decisions as the "equivalent of a direction." Stone, his successor, referred to Williams as the "key man" who "worked right along with" the officers and directors. Stone, Kilmarx and other officers and directors admitted they attempted to meet Williams' desires and to carry out his ideas.

Certain officers of Central States who were also directors were granted options to purchase Central States' stock at prices considerably below the prevailing market under an arrangement that if the options were exercised, the stock was to be supplied by New Empire. Incidentally, this arrangement was approved at the very meeting of the Board at which the Directors approved one of the transactions complained of, one between Central States and a wholly owned Williams' company.

Another circumstance which points strongly to Williams' domination of the officers, directors and affairs of Central States, is the destruction of records. When it became known in 1936 that the SEC was investigating investment holding companies, word got around in the Central States organization to destroy all records pertaining to Williams. Thereafter, over an extended time, thousands of files were removed and destroyed. Clerical personnel were directed and assisted by Kilmarx and heads of departments who were also directors of Central States, as well as officers of Williams' wholly owned companies. The job was completed by the time the SEC investigators arrived. No secondary evidence of the contents of the destroyed records has been supplied other than the suggestion that they contained statistical material, corporate reports and other data, some of which was supplied to Williams in confidence. With one possible exception,[8] we do not know whether these records had any direct bearing on the issues in this case but we do know that Williams' interests were a prime consideration in the purging of the files. The removal of documents bearing reference to Williams was repeated on subsequent occasions.

I draw no adverse inference from the destruction or the removal of Central States' records with respect to specific transactions, since it would require speculation to infer their contents. However, the action taken in obliterating the records is further evidence of Williams' power and domination over the directors, officers and employees of Central States.

8. Certain vault records which would have clarified dates of delivery of stock discussed under the "B" transaction.

A careful appraisal of this record reveals a continued policy of acquiescence by all of the directors and officers of Central States in everything proposed by Williams, including contracts or commitments between his personal companies and Central States. His wish was a command, faithfully executed by officers and directors alike. The record abundantly establishes that their loyalty was to Williams and not to Central States and that Central States was regarded as but another link in the Williams' chain of companies.

The defendant directors invariably followed Williams' judgment and their judgment was neither independent nor considered. They yielded to Williams' dictation and decision and abdicated their responsibilities and obligations to Central States. The plaintiffs have sustained the burden of establishing that Williams was not only the controlling stockholder of Central States but dominated all of its affairs and operations. The plaintiffs also charge defendants with conspiracy, but this they have failed to sustain.

### The Law

Before discussing the separate transactions about which the plaintiffs complain, it will help to set forth the general principles of law on the basis of which each of these transactions is to be judged and liability determined. These are clearly and emphatically set forth by Mr. Justice Douglas in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, as follows: "A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099. Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall. 616, 624, 22 L.Ed. 492. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." 308 U.S. at pages 306–307, 60 S.Ct. at page 245.

This statement has been characterized as "perhaps the strongest recent statement of the duties of majority stock interests". Crawford v. Mexican Petroleum Co. Ltd. of Delaware, 2 Cir., 130 F.2d 359, 361. The principles are severe, but understandably so. The immunity afforded by the business judgment doctrine,[9] under which acts in good faith and in the exercise of an honest judgment conclude the corporation and the stockholders is rooted in the concept of arm's length bargaining. In the context of domination or control there can be no arm's length bargaining.

In the view of Mr. Justice Douglas, the rule is clearly applicable in the case of either a dominant or controlling stockholder. As stated by Mr. Justice Brandeis in Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099, "It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation." 250 U.S. at page 492, 39 S.Ct. at page 537.

This standard has been applied by the New York Court of Appeals in Chelrob, Inc., v. Barrett, 293 N.Y. 442, 57 N.E.2d 825. The Court held a transaction with a controlling stockholder subject to judicial scrutiny as to its fairness notwithstanding findings that "good faith is established by persuasive evidence", 293 N.Y. 460, 57 N.E.2d 834, the directors acted "honestly and carefully," 293 N.Y. 451, 57 N.E.2d 828, were not "remiss in the performance of their duties", 293 N.Y. 452, 57 N.E.2d 830, and the controlling stockholder "did not usurp the functions of the directors and dominate * * * their actions". 293 N.Y. at page 460, 57 N.E.2d at page 834. But

9. See Pollitz v. Wabash R. R. Co., 207 N.Y. 113, 100 N.E. 721.

since the directors acted in good faith and on the basis of their own considered judgment, the Court of Appeals dismissed the complaint as against them.

■■ Where, however, directors do not act in good faith or with the care and independent responsibility which their status demands, they, too, would be liable. "The relation of the directors to the stockholders is essentially that of trustee and cestui que trust. The directors are bound by all those rules of conscientious fairness, morality, and honesty in purpose which the law imposes as the guides for those who are under the fiduciary obligations and responsibilities. They are held, in official action, to the extreme measure of candor, unselfishness, and good faith. Those principles are rigid, essential, and salutary." Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 193, 123 N.E. 148, 151. See also Blaustein v. Pan American Petroleum & Transport Co., 293 N.Y. 281, 56 N.E.2d 705.

The test of fairness does not permit of precise definition; it involves a judgment based on all the factors and circumstances. Chief Judge Learned Hand offers some guide in his opinion in Ewen v. Peoria & E. Ry. Co., D.C., 78 F.Supp. 312, certiorari denied, Income Bondholders of Peoria & E. R. Co. v. New York C. R. Co., 336 U.S. 919, 69 S.Ct. 642, 93 L.Ed. 1082, where he observed that " 'whether the proposition submitted would have commended itself to an independent corporation' " is very close to the proper test of fairness, and as another approach suggests "whether the actual [transaction] was worse than the [corporation] would have accepted, or could have been forced to accept" had the parties traded at arm's length, 78 F.Supp. at pages 316, 317.

As to those defendants who were not directors or fiduciaries of Central States, the governing rule is that one who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust, becomes jointly and severally liable with him. Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418; also Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121. Certiorari denied, Biddle v. Irving Trust Co., 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243.

The questions of law involved in the defense of the statute of limitations interposed by the defendants in this case will be considered later in this opinion.

### Transaction "A"

■ This transaction revolves about the acquisition by Central States of shares of the common stock of the Shenandoah Corporation upon its organization in July 1929. Recovery is sought not only against Williams, and Fogarty, Freeman, Stone and Kilmarx, directors of Central States, but also against the directors of Goldman Sachs Trading Corporation, the individuals composing the partnership of Goldman, Sachs & Co. and the directors of the Shenandoah Corporation.

Goldman, Sachs & Co., an investment banking firm, had long been engaged in the financing of industrial and general business corporations. In 1928 it formed the Goldman Sachs Trading Corporation, hereinafter sometimes referred to as Trading. The partners of Goldman, Sachs & Co. made substantial investments in the stock of Trading and the balance of the stock was sold to the public. Prior to the organization of Shenandoah, Trading's activities were principally in securities of industrial companies, for which Goldman, Sachs & Co., had acted as bankers.

Early in 1929, John Foster Dulles, senior partner of the law firm representing both Trading and Goldman, Sachs & Co., and Waddill Catchings, senior partner in Goldman Sachs and a director of Trading, conceived the idea of forming an investment company which would enable Trading to participate in public utility securities which were then in great demand, and at the same time make available to the investing public a security of a company dealing in both industrial and utility stocks. Since Trading's own experience had been limited to industrials, the Trading group wanted to affiliate with a person or group experienced in the light and power field.

Dulles knew Williams, one of the recognized leaders in the utility field, and intro-

duced him to Catchings in June 1929. There ensued a series of almost daily meetings over a period of six weeks between Williams and Catchings, out of which developed the plan for the formation of the Shenandoah Corporation. The corporation was to have the benefit of the combined skill and experience of Goldman Sachs, especially qualified and experienced in industrial investments, and of Williams with his matching competence in the field of utility investments.

All of the major negotiations were conducted by Catchings representing the Trading and Goldman Sachs groups, and Williams who then owned 96% of Central States common stock. It was agreed that the new corporation was to be sponsored jointly by Trading and a company to be designated by Williams. He designated Central States. In substance, Trading and Central States each agreed to exchange $25,000,000 in market values of its stock for a 40% equity in the new company. The 20% balance of the common stock, and all of the preference stock were to be sold to the public. At the time the understanding was reached on July 9th, 1929, Central States stock was selling on the market at $52 and Trading at $105, requiring Central States to deliver to Shenandoah 482,000 of its shares and Trading to turn over 238,000 of its shares.

The preference stock of Shenandoah to be sold to the public was, in the first instance, to be bought by Central States and Trading and then sold to the public through the bankers, Goldman, Sachs & Co.

In this transaction we are concerned only with the common stock.

Paragraph "Fourth" of the definitive agreement which was not approved until July 24th provided: "Central States will issue or cause to be delivered to the New Company in such names as it may specify 480,770 full-paid and non-assessable shares of the common stock of Central States, as such shares shall be constituted after giving effect to the 200% stock dividend payable July 25, 1929 of which at least 384,616 [10] shares shall be of original issue and shall pay to the New Company $20,000,000 in cash, together with a sum in cash equal to the accrued dividend on the 500,000 shares of preference stock hereinafter mentioned; Trading will issue and deliver to the New Company in such names as it may specify 238,096 full-paid and non-assessable shares of the capital stock of Trading, all of which shall be of original issue, and shall pay to the New Company the sum of $20,000,000 in cash, together with a sum in cash equal to the accrued dividend on the 500,000 shares of preference stock hereinafter mentioned. * * *"

The $20,000,000 cash was to be derived from the $25,000,000 which each, Central States and Trading, expected to receive upon the sale of the preference stock to the public. The net effect of this provision as far as Central States is concerned, was that it was to receive 2 million shares of Shenandoah common, valued at $10 per share, and $5,000,000 cash, a total of $25,-000,000 in value, for 480,770 shares of its common stock.

The charge against the defendants on this transaction centers about the $5,000,000 cash and the delivery to Shenandoah of 96,154 shares of Central States common, not of original issue, but which Central States purchased from Nasco, a Williams wholly owned company.

The contract between Central States and Trading for the formation of Shenandoah was ratified by Central States' Board of Directors on July 24th, 1929. The Board authorized the issuance of 384,616 shares of its unissued common stock. At the same meeting the Board also authorized the purchase from Nasco of 96,154 shares of Central States' common stock at $52 per share, making a total price of $5,000,000. Also approved was an agreement between Central States and Trading, referred to as an equalization agreement, which provided that if upon a reappraisal of the stocks within certain prescribed periods, the ratio of the market prices of the two stocks (Central States at $52 and Trading at $105) at which they were taken in by Shenandoah

10. 80% of the total of 480,770.

no longer obtained, appropriate adjustment would be made to reestablish it.

Thereafter on August 7th, 1929, the transaction was closed as contemplated under these agreements. Central States received from Goldman, Sachs & Co. $25,-000,000, the proceeds from the public sale of the 500,000 preference shares, $20,000,-000 of which it paid to Shenandoah as required by Paragraph "Fourth" of the contract. The balance of $5,000,000 was paid to Nasco for the 96,154 shares, which, together with the 384,616 shares of original issue totaling 480,770 shares of its common stock, Central States turned over to Shenandoah, and in turn received 2,000,000 shares of Shenandoah common.

The trustees claim that under the contract Central States had the right to deliver to Shenandoah all of the 480,770 shares and to retain the $5,000,000 cash as well as the 2,000,000 shares of Shenandoah. It is charged that Williams, with the connivance of the directors, deprived Central States of the full benefits of its right to perform under the contract. As plaintiffs put it, Williams "carved the juiciest part" of the contract—the cash—for himself and the Central States Board acquiesced and approved it without regard for Central States' interest.

When the Shenandoah and Nasco contracts were approved on July 24th, the directors who were present and authorized and approved them included Fogarty, Freeman, Kilmarx and Stone. None of them personally profited or benefited from this transaction or from any of the others under attack. Stone had shortly prior to the transaction been elected president of Central States at Williams' instance. He was called in towards the very end of the Shenandoah negotiations to work out the mechanics of the plan. It does not appear that he or any other director of Central States actively participated in discussions or decisions on major policy matters.

In view of Williams' relation to Central States and his domination of its affairs and activities, the court must be satisfied not only as to "the good faith of the transaction but also * * * its inherent fairness from the viewpoint of the corporation and those interested therein." [11]

The basic business reason assigned by the directors of Central States for not issuing all of its own shares needed for the Shenandoah transaction was that they regarded it as sound policy for Central States to retain stock as against cash. The primary purpose of the transaction, they say, was to get a 40% equity position in Shenandoah and not the cash. This, Central States received and kept. The $5,000,000 which Central States would have received had it issued the full 480,770 shares instead of the 384,616, would, they claim, under their policy of "Invest and Keep Invested" have been expended at once for other securities. Finally, it is urged that they were confident that Central States common was worth more than its then current market price and they point to the general optimistic attitude prevailing at that time, and the general belief that the period was one of continuing prosperity and increasing values. They cite the fact that the newly issued Shenandoah stock was oversubscribed at $17.50 per share, although the price to Central States was $10, and that the market reached $38 within a few days.

The matters under consideration must be cast in the period during which they occurred and against the background of facts as they then existed. This was July 1929. The nation was enveloped in a spirit of marked optimism which extended no less to leaders of industry and finance than it did to the average investor. The steady advance of stocks was assumed by many to reflect a sound economy and continuing prosperity. We know now that it was an era of frenzied finance and wild speculation.

In July 1929 Central States' directors believed that the market had not reached its limit. Their basic policy was to keep invested—that an inventory of stock was of greater value than cash.

They point to the fact that the price of $52 for Central States common was based on the market price on July 9th, 1929, when the terms of the Shenandoah deal had

---

11. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281.

been agreed upon tentatively between Catchings and Williams; that on July 24th, 1929, when the contract was approved by Central States' Board, the market price had advanced to $82 per share, and that, accordingly, so long as the stock could be obtained from Williams, through one of his companies, and he was willing to sell at $52, it was not only fair but signally advantageous to Central States to buy the stock from Nasco instead of using its own 96,-154 shares.

The Court is persuaded that it was the policy of Central States to hold securities and not cash, and that at that time it was assumed by most people, however misguided, that security values would keep going up. The continuing rise in the price of Central States stock was fairly cogent proof of a rising market.

It is further contended by plaintiffs that Williams deprived Central States of its corporate opportunity, as distinguished from an invasion of its rights under the contract once it was signed, by injecting himself into the deal and so negotiating it as to permit him to take a portion of the deal for himself.

The credible evidence establishes that Trading was interested in merging forces with Williams and not primarily Central States. Trading sought association with Williams because of his ability and know-how in the power and light industries, which was his special area of prestige and influence in the financial and investment world. Catchings and his group were interested in Williams, the individual, and not in Central States. Central States was merely one of the companies in which Williams had a substantial personal interest and which itself had extensive investments in holding and utility companies.

The importance of Williams personally is demonstrated by his acceptance of membership on the Board of Directors of Shenandoah,—a departure from his fixed policy of not being a director of any company in which he was heavily invested.

This was not a business opportunity which was presented to or belonged to the corporation. In essence, this was Williams' deal—his opportunity. He was, at the outset, given the right to name any one of the companies which he controlled. As I see the record, he retained for himself 20%, with the rest going to Central States. Williams was free under the facts of this transaction to have handled it entirely for himself. If, in the first instance, he had, out of his vast holdings of Central States common, at that time in excess of 7,000,000 shares, undertaken to deliver to Shenandoah the full 480,770 shares through any of his wholly owned subsidiaries, Central States would have been in no position to complain. There is no evidence that the Goldman Sachs group preferred Central States to any other Williams' company. It cannot be said, as plaintiffs contend, that Central States was entitled exclusively to participate in the Shenandoah deal. The participation by Williams appears to have been part and parcel of the transaction rather than a last minute contrivance.

The doctrine of corporate opportunity has been held not to apply where the business opportunity comes to the officer or director or controlling stockholder in his individual capacity and where the opportunity is not essential to the corporation or is one in which it has no interest.

" 'where a business opportunity comes to an officer or director in his individual capacity rather than in his official capacity as an officer and director, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which the corporation has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it.' " Blaustein v. Pan American Petroleum & Transport Co., 263 App.Div. 97, 126, 31 N.Y.S.2d 934, 962 (1st Dept.), affirmed 293 N.Y. 281, 56 N.E. 2d 705, quoting with approval from Loft, Inc., v. Guth, 23 Del.Ch. 138, 2 A.2d 225, 238 affirmed 23 Del.Ch. 235, 5 A.2d 503.

Upon either theory, that is, the deprivation of corporate opportunity or interference with a corporate right already in be-

ing, the same result is reached. The evidence does not warrant a finding that Williams interfered with a corporate opportunity which belonged to Central States, or, once the contract was signed, that the delivery of the 96,154 shares of stock by Nasco rather than Central States, was under the then existing circumstances unfair.

This conclusion makes it unnecessary to consider the charges made against the directors of Goldman Sachs Trading Corporation, Shenandoah or the partners of Goldman, Sachs & Co.

In respect of transaction "A" all the defendants are entitled to judgment dismissing the complaint upon the merits.

### Transaction "B"

In this transaction it is charged that Williams and other defendants invaded Central States' contract right to sell 68,423 shares of North American stock and to retain the proceeds of $11,426,641. The plaintiffs also complain about an accompanying interest payment of $34,279.92 made by Central States to the Williams' companies. Named as defendants, in addition to Williams and directors Stone, Freeman, Fogarty and Kilmarx, are members of the accounting firm of Touche, Niven & Company, who are charged with having made improper entries on the books of Central States in furtherance of Williams' purpose to overreach Central States in this transaction.

The Shenandoah Corporation was launched with marked success. The public offering of its stock was oversubscribed seven times. This led to the formation of still another company, the Blue Ridge Corporation, sponsored jointly by Central States and Trading. Blue Ridge was to follow the investment program of Shenandoah in industrial and utility stocks. Again, both Williams and Catchings were the principal architects, but in this instance there can be no doubt that Williams acted as agent for Central States. The participation by the defendant directors was confined to carrying out the policy decisions reached by Williams and Catchings.

The basic organization agreement was signed on August 19th, 1929. The capital of Blue Ridge was fixed at $127,500,-000. Shenandoah was to purchase 6,250,-000 shares of the common stock, 86% of the total for $62,500,000. In order to put Shenandoah in funds to acquire the Blue Ridge stock, Central States and Trading each agreed to purchase from Shenandoah 375,000 shares of its common stock for $12,500,000 and 375,000 shares of its $50 par value preference stock for $18,750,000, adding up to $31,250,000 for each, and a total for both of $62,500,000. The closing date was set for September 5th, 1929.

On August 21st, Blue Ridge also entered into agreements with Central States and Trading, under which Blue Ridge agreed to purchase from each various securities at market prices at the close of business on August 17th, 1929. We are concerned only with the Central States agreement. Central States agreed to sell and Blue Ridge agreed to buy blocks of nine different securities for $35,000,041. One of the blocks consisted of 68,423 shares of North American common stock at $167 per share, totaling $11,426,641. The Board of Directors of Central States at a meeting held on September 3rd, 1929, ratified and approved the sale of the various securities and authorized the officers to carry out the agreement.

There is a sharp dispute as to when, if at all, Central States delivered the securities to Blue Ridge, which we shall discuss presently. It is not disputed that on September 5th, 1929, the closing date, Central States received from Blue Ridge $35,000,-041, representing the agreed price for the entire package of securities, including the 68,423 shares of North American, and that Stone, as president of Blue Ridge, acknowledged receipt of the securities and Kilmarx, as Treasurer of Central States, acknowledged payment in writing as follows:

"Received of Central States Electric Corporation pursuant to the agreement between us dated August 21, 1929, the following securities of an aggregate value of $35,000,041 in full satisfaction of the ob-

ligations of Central States Electric Corporation under said agreement:

| Shares | | Closing Market 8/17/29 | Total |
|---|---|---|---|
| 29,200 | Commercial Investment Trust Corpn. ........... | 185 | $ 5,402,000. |
| 69,000 | Mathieson Alkali Works | 59 | 4,071,000. |
| 18,000 | Detroit Edison Company | 349 | 6,282,000. |
| 7,900 | Stone & Webster ......... | 166 | 1,311,400. |
| 14,000 | Pacific Gas & Electric Co. | 76¾ | 1,074,500. |
| 4,000 | Peoples Gas Light & Coke Co. ..................... | 396 | 1,584,000. |
| 7,000 | American Tel. & Tel. Co... | 293 | 2,051,000. |
| 10,000 | Consolidated Gas Co. of New York ............. | 179¾ | 1,797,500. |
| *68,423 | The North American Co... | 167 | 11,426,641. |

September 5, 1929.

BLUE RIDGE CORPORATION

By C. F. STONE

Pres.

"RECEIVED of Blue Ridge Corporation $35,000,041. in full payment for the securities listed above.

September 5, 1929.

CENTRAL STATES ELECTRIC CORPORATION

By L. E. KILMARX

V. P."

There is no other written record, memorandum or entry of any other aspect of the transaction until September 23rd, 1929, when Central States issued to four Williams' companies checks totalling $11,426,-641, the exact amount previously received by it for the North American shares, as follows:

| Payee | Amount | Number of North American Shares |
|---|---|---|
| Electric Investment ..... | $ 1,670,000 | 10,000 |
| Utilities Securities ...... | 3,340,000 | 20,000 |
| Federal Utilities ......... | 3,340,000 | 20,000 |
| New Empire ............ | 3,076,641 | 18,423 |
| | $11,426,641 | 68,423 |

These checks were in payment of the 68,423 shares of North American delivered by the Williams companies to Blue Ridge sometime after the closing date, September 5th.

The evidence does not definitely establish when the Williams' companies deliv-

ered the North American shares but at the earliest it was September 23rd;[12] and there is sufficient evidence to support a finding that in fact a substantial number, 18,423 shares, were delivered later, on October 16th, which may account for the fact that a portion of the interest charged against Central States was not paid before October 23.[13] The net result was that eventually Williams' companies, and not Central States, sold the 68,423 shares of North American and received from Central States the purchase price, and in addition the interest payment.

The plaintiffs charge that Central States' right to sell and retain the proceeds of the sale, with its incidental profit, had been invaded by Williams, who with the acquiescence of the directors appropriated that right for himself. They point out that Central States had 839,000 shares of North American stock and was well able to make the sale; that the price at which Central States was to sell was a good one to it; that Central States was without cash funds to meet its obligation of $31,250,000 to Shenandoah for the purchase of the preference and common stock; that the average cost of North American shares to Central States according to its books, was $11 and with the sale price at $167 it stood to realize a profit of more than $10,650,000; that Williams' companies in selling the shares realized a profit of $10,727,764.59.

The transaction is defended on various grounds, paralleling substantially those advanced to uphold the "A" transaction. Here, too, it is urged that Central States' corporate policy and its own interest was to invest and stay invested; that Central States was the largest holder of North American stock (it owned directly and indirectly 25%), which represented its largest single investment, and that it was its fixed policy not only to retain that stock but to increase its North American holdings; that with Williams, instead of Central States, selling the stock of North American, Cen-

---

* These are the shares involved in this transaction.

12. Kilmarx testified that missing vault records would establish the exact date of delivery.

13. Interest was paid by check to three of the Williams' companies on October 23rd, 1929, and to another Williams' company on November 12th, 1929.

tral States indirectly increased its holdings in North American through its interest in Shenandoah which owned in excess of 80% of Blue Ridge; and conversely, had Central States itself made the sale it would have reduced its stake in North American.

The credible evidence is far from convincing that the reasons now advanced to justify the transaction were those which motivated it. The testimony in support of the transaction is weak and unpersuasive. Indeed, the record justifies a holding that the officers of the Williams' companies, some of whom were also officers and directors of Central States, simply substituted North American stock of the Williams' companies to accommodate Williams' personal interests. In so doing, they violated their trust to Central States.

In the Court's view, the sale by the Williams' companies was not conceived and undertaken until almost three weeks following the sale by Central States, during which time Central States of course had the proceeds. Interest was not paid on September 23rd, 1929 when Central States paid the $11,426,641 to the four Williams' companies.

The attempt to justify this transaction on the same basic grounds as those advanced in support of the "A" transaction must fail for there is substantial variance on the facts. The contrast between the circumstances surrounding this transaction "B" and those of the "A" transaction is so marked as to carry its own condemnation of this transaction. In the instant transaction, other than the assertions of those directors who testified on the subject, proof is lacking that delivery of the North American shares by Williams was contemplated either during the negotiations or up to the very time when the delivery was made by the Williams' companies, no earlier than September 23rd, eighteen days after the Blue Ridge closing.

Here, no single person of the Trading group, Catchings or any other of its representatives, testified as to any knowledge that Williams' companies, and not Central States, intended to deliver the shares, although the matter of creating a portfolio of securities for Blue Ridge was the sub-

ject of extended discussions between representatives of the two sponsoring groups.

The defense contends that it was always understood by the directors that Williams, and not Central States, would sell the North American stock, and that this was known throughout the negotiations, on August 21st, the date of the letter agreement for the sale of the stock by Central States, and on September 3rd, when the Board of Directors approved the sale. It is significant that despite this claim, no resolution or minute recording that fact or any commitment by Williams was entered in any corporate record. In the "A" transaction the contract between Central States and Nasco was acted upon at the very meeting that the major transaction was approved, and Nasco was firmly bound to make delivery.

Even if the story that it was always intended that the Williams' companies were to deliver the shares were to be accepted, they were, in the absence of any binding agreement, free to deliver or not to deliver. This put Williams as a fiduciary in an advantageous position to Central States' disadvantage.

It is no answer to suggest that neither was any entry made in the minutes with respect to other securities which Central States was obligated to sell to Blue Ridge under the letter agreement and which it obtained from other sources. Of the nine blocks of securities to be sold thereunder, Central States did not have six and the directors knew these had to be obtained elsewhere. But it did have the remaining three, including the North American stock. Two of these three Central States delivered out of its own portfolio holdings, but not the North American, which it had in abundance.

The sale of the securities by Central States was deemed of sufficient importance to require Board action. Yet, revocation of that action is nowhere recorded. The sale by Williams' companies, instead of Central States, effectively reversed the resolution of the Board. The testimony that during the negotiations Williams indicated he was willing through his companies to furnish the North American stock if Cen-

tral States preferred not to sell and that the directors, after careful consideration, decided to retain the stock and accept Williams' offer, is not on this record credited.

Considerable testimony was taken on the question of the dates of delivery and transfer of the shares, much of it relating to when, if at all, Central States delivered the shares directly to Blue Ridge.

The defense contends that notwithstanding the receipt signed on September 5th by Stone on behalf of Blue Ridge, acknowledging receipt from Central States of the 68,423 shares, Central States in fact never delivered them on that day or at any other time. It suggests the closing was by means of a due bill—a promise by Central States to deliver at a subsequent date—and that thereafter on September 23rd, the Williams' companies made good on the due bill by delivering their North American shares. No credible proof was offered that the closing was on the basis of a due bill and the suggestion finds no support in the very considerable testimony which attempted to trace the shares of stock, by whom delivered, and the dates delivered. Stone issued and signed the receipt acknowledging delivery by Central States on September 5th of all the securities, including North American shares. No satisfactory explanation has been offered by Stone or any of the other defendants why he should have acknowledged receipt of the securities when, in fact, they had not been delivered. Even if we were to disregard, which we do not, the testimony of Kilmarx on the subject, who, after some contradictions, convincingly testified after examining certain records, that he was positive that Central States had delivered the securities, the evidence still requires a finding of delivery on September 5th by Central States. Kilmarx testified that all of the securities for which Stone had issued the receipt, were delivered on September 5th, at the time of closing, and that they, including the 68,423 shares of North American were taken out of the Central States vaults and placed in the Blue Ridge vaults. Kilmarx, at that time, was treasurer of Central States, Blue Ridge and the four Williams' companies.

As to when the 68,423 shares were returned to Central States, the record is not altogether clear. But Kilmarx related "the practical way" of handling the delivery by the Williams' companies on September 23rd, or later. His recollection was that he substituted in the vault box of Blue Ridge the 68,423 shares from the Williams' companies in place of the 68,423 shares which Central States had delivered on September 5th.

The vault records of the Williams' companies would have shown definitely the various delivery dates but these were reported missing, with the exception of the vault record of New Empire. This vault record shows that New Empire delivered to Blue Ridge 18,423 shares on October 16th, 1929. New Empire received payment from Central States for this number of shares on September 23rd, and Central States also paid interest amounting to $9,229.92 thereon to New Empire on November 13th, 1929.

The Court finds that on September 5th, the closing date, Central States delivered to Blue Ridge its own 68,423 North American shares referred to in the letter agreement of August 21st; that the Williams' companies delivered to Blue Ridge 68,423 shares of North American of which 18,423 were delivered on October 16th and the remainder no earlier than September 23rd; and that the shares of stock previously delivered by Central States to Blue Ridge were returned to it; that at no time prior to September 23rd was it contemplated that Central States would not make the sale and retain the proceeds thereof and that up to that time the directors who participated gave no consideration to the business reasons which they say impelled their actions, but rather carried out Williams' purpose in having his companies instead of Central States sell the North American stock—and this in violation of a corporate resolution of the Board of Directors directing the sale by Central States.

The Court concludes, to state it bluntly, that this was simply a case where after Central States sold and made delivery of the stock and received the proceeds of the sale, Williams, whatever his reasons, which

we need not probe,[14] decided to avail himself of the cash. The funds which belonged to Central States landed in Williams' companies treasuries on September 23rd. Thus, Central States' absolute right under its contract with Blue Ridge to receive and retain the $11,426,641 was invaded.

Williams violated his fiduciary obligations to the corporation and imposed upon it a transaction that lacks any acceptable elements of fairness to Central States.

Of the directors, only Kilmarx and Stone appear to have played an active role. In permitting this transaction to take place they were negligent of Central States' interest and failed to exercise due care. Fogarty voted only at the board meeting approving the letter agreement of August 21st with Blue Ridge, and there is insufficient evidence upon which to hold him for participation in the events which led to the substitution by Williams' companies of the North American shares. Freeman was out of the country at the time of the Blue Ridge deal; he was not present at the Board meeting which approved the sale by Central States, and here, too, there are insufficient facts to indicate that he aided Williams in the furtherance of his purpose.

■ The plaintiffs also seek to hold members of the firm of Touche, Niven & Company, accountants for Central States. The charge against these defendants is that in furtherance of Williams' design to overreach Central States and in violation of their obligations and in complete subservience to his wishes, and with full knowledge of Central States' right to sell the North American stock to Blue Ridge and to retain the proceeds of the sale, they made or permitted entries on the books of Central States, the effect of which was to make it appear, contrary to fact, that Williams' companies and not Central States were the sellers of the stock.

These defendants, in addition to accounting services, performed bookkeeping services for Central States and had possession of its books of original entry wherein entries were made from records usually delivered to them by messenger. Minutes and other corporate records were also available to the accountants.

They also acted in the same capacity for Federal Utilities, Electric Investment and Utilities Securities, three of the four Williams' companies which received payments from Central States for the North American Company stock. Here, too, Touche Niven performed bookkeeping and auditing functions and kept the books at its office, making the entries from records sent over by the companies.

To establish their claim, plaintiffs rely upon certain erasures and alterations in Central States' books. An original entry in the journal indicated there was due to Central States a total of $35,000,041 for the securities sold under the letter agreement of August 21st and itemized separately each security listed and the sales price thereof, including the 68,423 shares of North American stock for $11,426,641. The words "North American common" were removed by ink eradicator and "Sundry Debtors" substituted. On another page of the journal, in connection with these shares, the words "Accounts Receivable" were similarly erased and the words "Sundry Debtors" inserted. The substituted entries reflected a sale of the North American shares by somebody other than Central States.

Plaintiffs rely upon the original entries and the changes, as well as other entries and omissions, to substantiate their charges, offering no other proof. They contend that the accountants, through their representative who made the entries on the books, knew of the contract for the sale by Central States of the 68,423 shares of North American, and of the approval of the sale by the directors; also that they knew of the subsequent delivery of the shares on September 5th by Central States to Blue Ridge and the receipt by Central States of the proceeds of the sale, and that Central States had thereafter paid the proceeds to the Williams' companies on September 23rd, before the Williams' companies de-

14. For several weeks prior to the contract to sell, the North American stock was subject to market fluctuations.

livered any of the stock, and that notwithstanding, and without authorization by Central States' Board permitting any variance, the Touche Niven representative made the entries and the changes which concealed the true facts and made it appear that Central States was not the vendor of the stock.

The Touche Niven representative who made the entries in question is dead. The plaintiffs stipulated that if the defendants of the Touche Niven group were called, they would testify that as members of the firm they had no knowledge of any instructions by any officer or director of Central States or by Harrison Williams on how or what entries to make in Central States' books of account; that insofar as they have any knowledge or information, the entries were made in good faith and not for the purpose of any personal advantage to Williams at the expense of Central States.

A certified public accountant who testified as an expert for the defendants stated that the entries were made in accordance with accepted principles of accounting, that they reflected the transaction as it was consummated and that the entries as they now appear on the books reflect a state of balance.

There is no proof that the defendants or their representative, now deceased, who made the entries, knowingly aided the plan to have the Williams' companies, instead of Central States, deliver the stock. The mere fact that there is an erasure does not give rise to knowledge of or participation in any wrongful purpose. Erasures in books of account and alterations to correct errors are common occurrences. The testimony of the expert that without the corrections the books would have been out of balance, was not rebutted.

The record does not sustain the serious charge made against the Touche Niven defendants and they are entitled to judgment dismissing the complaint upon the merits.

There remains the question of the nature of the relief to be granted.

The plaintiffs claim rescission and a right to be restored to their original position. They seek the sums of $11,426,641 and the interest item, $34,279.92 with appropriate interest, and tender the return to Williams and his four wholly owned companies of 68,423 shares of North American Company common stock and all the dividends and benefits received incident to ownership thereof from September 1929 to the date hereof.

The defendant Williams resists rescission on the ground that not he, but four of his wholly owned companies were parties to the transaction here condemned. Three, New Empire, Electric · Investment and Federal Utilities, were served with process, but on motion the action was dismissed against each for improper venue. The fourth, Utilities Securities, has been dissolved and as to it the motion to dismiss was granted on the ground that it was not amenable to suit. Consequently, he argues that since the Court does not have jurisdiction of the corporations, the transactions to which they were parties cannot be cancelled or rescinded, nor may a constructive trust be impressed as he, Williams, did not acquire legal title to any of the property now sought by the plaintiffs.

 In my opinion these factors do not bar the plaintiffs from obtaining in this action an undoing of the transfers of cash and the shares of North American stock. Williams' domination of Central States and the four corporations which received the cash was complete. He used the four corporations as agents for the transaction of part of his own business, thus making himself responsible for their acts. Rapid Transit Subway Construction Company v. City of New York, 259 N.Y. 472, 488, 182 N.E. 145. Even were domination not so complete, considerations of "honesty and justice" may compel a Court to decide the same way. 259 N.Y. at page 489, 182 N.E. at page 150; Hollander v. Henry, 2d Cir., 186 F.2d 582, 584, certiorari denied 341 U. S. 949, 71 S.Ct. 1017, 95 L.Ed. 1373.

The "B" transaction was carried out on Williams' instructions and for his personal benefit. Had he caused shares from his personal portfolio to be transferred to Central States and the cash transferred from Central States into his personal bank account, no questions would be presented.

What actually occurred, in view of the pattern of Williams' operations, was in substance the same. Each and every one of the four corporations, one hundred per cent owned or controlled by him, was the instrumentality by which he effected his purpose.[15] To Williams at the time of the transaction neither the particular source of the securities nor the particular recipient of the cash was material, provided both were under his control and acted on his instructions and for his benefit. Receipt of the cash by his personal corporations was the equivalent of receipt by him, and in this sense they were his pockets. The way in which the payments by Central States were made without formal regard as to which company delivered what number of shares indicates the manner in which Williams operated the financial affairs of his personal companies and his complete power to direct the transfer of cash in the manner best suited to his decisions.[16]

Williams is before the Court. To allow the absence of the pocket corporations to bar relief requiring Williams to restore the cash over which he had absolute power of disposition would be an unwarranted frustration of equity's power to correct injustice, and this, on the formal basis of the particular disposition of the funds and source of securities selected by Williams, although the selection had no ma-teriality in the transaction itself. The language of Chief Judge Lehman in Rapid Transit Subway Construction Company v. City of New York, supra, 259 N.Y. 488, 182 N.E. 150, summarizing two decisions of the Supreme Court[17] is appropriate to the situation at bar. " * * * the stockholder did not merely use its control of the corporation in the normal and usual manner, but used the corporation as an agent for the transaction of part of the stockholder's business. * * * liability rested, not upon a disregard of the independent personality of the corporation, but upon the principle of *respondeat superior* applicable even where the agent is a natural person."

▮ I conclude that rescission may be had against Williams. The plaintiffs are entitled in respect of this transaction "B" to a decree against him directing the return by Williams of the sums of $11,426,-641 with interest thereon from the 23rd day of September 1929, and of the interest payments totalling $34,279.92 with interest from the dates the interest payments were made upon the return of 68,423 shares of North American Company common stock, and all the dividends and benefits received incident to ownership thereof from September 1929 to date.

The enforcement of this decree against Williams should result in complete restora-

---

15. There are a number of examples in this record to demonstrate that these companies were used as if they were Williams himself who was acting; e.g., in the "J" transaction, where Williams' basic claim is that he made a personal con-tribution of Central States common, it was New Empire which transferred the shares to wholly owned Williams' companies to carry out the intended purpose. (See footnotes 23, 24 post.)

16.

| Name of Williams' Wholly-Owned Corporations | Shares of North American Company Stock Transferred Under "B" Transaction | Amount Received from Central States |
|---|---|---|
| Electric Investment | 25,000 | $1,670,000 |
| Federal Utilities | 25,000 | $3,340,000 |
| New Empire | 18,423 | $3,076,641 |
| Utilities Securities | none | $3,340,000 |

17. Chicago, Milwaukee & St. Paul Railway Company v. Minneapolis Civic & Commerce Association, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229; Davis v. Alexander, 269 U.S. 114, 46 S.Ct. 34, 70 L.Ed. 186.

tion and render unnecessary the determination of the amount of damages for which the defendants Williams, Stone and Kilmarx are liable on this transaction. If there is a failure of complete restoration, plaintiffs may apply to this Court for assessment of damages or such other and further relief against defendants Williams, Stone and Kilmarx as may be appropriate in the circumstances.

The disposition herein is subject to a consideration of, the defense of the statute of limitations which is hereafter discussed.

### Transaction "C", "D" & "L"

Stock Dividend Policy and Dealer Distribution Program

Preliminary to a consideration of transactions "C," "D" and "L," reference has to be made to the stock dividend policy and a closely related activity, Nasco's so-called dealer distribution program from which, in some measure, these transactions stem.

### Stock Dividend Policy

Central States' dividend policy was patterned after and tied in with that of North American company whose stock constituted Central States' principal activity in the second phase of its history.

North American was the top holding company of a vast system of operating and holding companies in the public utility field. Its activities included the financing of affiliated companies. In order to increase capacity and earnings, these companies required heavy capital investments. In 1923 North American adopted a policy of paying common stock dividends in stock instead of in cash. The essential purpose of the program was to enable it to plough earnings back into operating subsidiary companies, making available funds for construction, plant and equipment. It was in effect a policy of self financing which reduced the need to obtain, from either bankers or through the public offering of securities, the cash required for expansion programs. This, at the same time eliminated the usual underwriting or financing costs. Under this "self financing" program, from 1923 to 1933, out of a total of roughly $185,000,000 available for dividends on its common stock, North American paid a cash dividend on only one occasion, in 1923, in the year the program was inaugurated—in the amount of $1,-200,000. Otherwise it paid stock dividends of 2½% or 1/40 of a share quarterly. Thus, in that period approximately $184,-000,000 was made available to operating subsidiaries.

North American's dividend policy presented problems to its stockholders. Since Central States' largest single investment was in the North American company, the receipt of stock dividends instead of cash largely influenced its own dividend policy. It, in turn, issued stock instead of cash dividends. The program was carried over to the two series of convertible preference stock issued by Central States in 1928 and 1929 through the inclusion of optional dividend features, under which the holder was required to give notice if he wanted the cash, otherwise the dividend was paid in stock. American Cities Power and Light Corporation and Electric Shareholdings, when organized as part of Central States' expansion program, also adopted the stock dividend program.

(a) Purpose of Dealer Distribution

The North American stock dividend policy, of course, also affected its stockholders other than Central States. There were those who wanted cash and accordingly sold the stock dividends on the market. Without a market, the stock dividend program could not have been continued. In order to maintain and stabilize the market, Williams, in 1923 when the stock dividend policy was first initiated, through his wholly owned New Empire Corporation, organized Nasco. The distribution program undertaken by Nasco was intended to maintain a ready market for the sale of dividend stock and to broaden the list of North American stockholders. As compensation for this service, North American paid Nasco $150,000 per year.

Broadening the market, according to the testimony, meant increasing the number of stockholders and widening the geographical area of distribution, acquainting security dealers with the stock, spreading information about the company and its plans,

and increasing acceptance of the stock generally. The number of North American stockholders increased from several thousand to forty thousand all over the United States. Profits made by stockholders upon the sale of their stock dividends naturally influenced the marketability of future issues. As a result of the dealer distribution program, Central States, as a stockholder of North American, could either retain the stock dividends and increase its investment, or at its option, sell the stock in an available and stabilized market.

(b) Method of Distribution

Nasco used investment dealers throughout the country to sell the shares to institutional and individual investors. To encourage the sale of the stock to investors who would retain the securities, Nasco paid dealers an extra commission on sales to purchasers who held on to the stock for a certain length of time. Dealers telephoned or wired orders to Nasco who filled them by delivery of the stock at the price of the last sale on the Exchange on the day the order was received. The demand was met either from an inventory which Nasco sought to maintain or by purchases on the Exchange, and generally these were kept in line with the dealer demand for the stock. The process has been referred to as buying on the market and selling off the market.

(c) Distribution of American Cities, Central States and Electric Shareholdings stock.

We have already noted that the dividend policies of Central States, American Cities and Electric Shareholdings were patterned after North American. Their stock dividend policy and the conversion feature of their preferred stocks and debentures also required a similar dealer distribution program for their common stocks.

Nasco's activities in North American stock were discontinued in 1928. Thereafter, it distributed the common stock of American Cities and, beginning in 1929, the common stocks of Central States and Electric Shareholdings. As owner of 80% of the Class B common stock of American Cities, Central States was receiving common stock dividends on 1,600,000 shares and was vitally interested in having a ready and broad market. It was also desirable for other stockholders to have a market.

Transactions "C," "D" and "L" must be considered against this background of the stock dividend policy and the dealer distribution program.

Transaction "C"

Late in 1928, Central States purchased 1,600,000 shares of the American Cities Class B stock representing an 80% equity interest in American Cities. From November 1928 to October 31st, 1929, Nasco bought and sold American Cities "B" stock in very substantial amounts.

On October 31st, 1929, Nasco was long 57,879 shares of the "B" stock at an average cost of $36 per share, involving a loss of $636,000 which increased to $800,000 when dealers returned an additional 12,316 shares because of cancellations or defaults. As a result of this and other losses, Williams decided sometime prior to October 31, 1929, to discontinue Nasco.

The defendants contend that effective October 31st, 1929, Nasco transferred to Central States its long position of 57,879 shares of American Cities "B" at the market price that day, $25 per share; that with respect to the unknown number of shares yet to be returned by dealers, these were also to be taken over at the same price of $25 per share. The transaction is sought to be justified on the ground that upon Nasco's discontinuance of the dealer distribution program it was in Central States' interest, as the largest holder of American Cities "B," to continue the dealer distribution activities without hiatus—and the justification is based upon the various reasons assigned for the dealer distribution program.

The plaintiffs claim that the purchase was foisted by Nasco upon Central States at a price of $25 per share by selling them "as of October 31, 1929," when the market price on December 3rd, the day the directors authorized the transaction, was $18; that it was handled "as of October 31, 1929," to relieve Nasco of part of the $800,000 loss.

In fact, the plaintiffs argue that this was an alternative plan to an abandoned plan to have Central States absorb the entire loss.

■ The fundamental issue is the fairness of the transaction, and the narrower factual issue is whether the purchase of these shares was made on October 31st, 1929, or on or about December 3rd, 1929, and then handled as of October 31st, 1929.

The arrangements for the takeover of Nasco position were made orally by Williams and officers and directors of Central States, principally Stone, its President. The takeover was authorized by Central States' directors at a Board meeting held on December 3rd, 1929. Of the eight directors who voted for its adoption, only Stone, Freeman, Fogarty and Kilmarx are named with Williams as defendants in this transaction. The resolution reads:

"After a statement of explanation by the President, on motion duly made and seconded it was unanimously

"Resolved, that the action of the officers in behalf of this Corporation in taking over from North American Securities Company its position in the matter of B stock of American Cities Power & Light Corporation (i. e., stock on hand and stock redeliverable to it upon sales not consummated) as of October 31, 1929, at market price of $25 as of that date, be and it hereby is approved."

Kilmarx was then Treasurer and a director of Central States, Nasco and American Cities, as well as a director and officer of other Williams' wholly owned companies. Stone was President and director of Central States and a director of three wholly owned Williams' companies. Every other director who voted for the resolution was also a director of one or more wholly owned Williams companies.

On December 4th, the day following the Board resolution, Kilmarx issued a purchase ticket dated "12/4/29 as of 10/31/29" indicating the purchase by Central States from Nasco of 57,879 shares of American Cities "B" at $25 per share for $1,446,999.-48. This was entered on Central States' purchase book. No purchase slip was is-sued for the 12,316 shares (those returned by the dealers) but an entry was made in Central States' purchase book indicating a purchase from Nasco at $25 per share for $307,900. The two entries total 70,195 shares, purchased by Central States from Nasco for $1,754,899.48. Central States made payment by crediting Nasco's loan account with that amount.

The explanation of the transaction comes principally from Kilmarx and Stone. The matter of the takeover and the terms was the subject of discussions between Williams and Stone subsequent to October 31st, and extending up to the date of the resolution. A final decision was reached by them in early December, at which time Kilmarx was first advised of it.

Drawing the most favorable inference from Kilmarx' testimony, it is to the following effect: that there was a commitment made by Central States to buy a block of American Cities "B" stock, which left open the number of shares and the price to be paid for them. These were not determined until early December.

With such essential terms as the number of shares and the price undetermined, the arrangement could hardly have been a valid contract. But separate and apart from this, the Court is of the view that this arrangement, effective as of a prior date, which required Central States to buy the shares at $7 over the market price prevailing on December 3rd, the date the directors approved the transaction, must be condemned.

The first documentary reference to the takeover is in the minutes of the December 3rd Board meeting.

Stone, whose testimony was also relied on to support defendant's position, was far from definite. He could not recall the explanation which he made to the Board of Directors as noted in the minutes of December 3rd; nor when he had the discussions with Williams relating to the takeover except that they took place some time after Williams indicated he planned to discontinue Nasco's operations and the distribution of the American Cities "B." He had no recollection that the transaction was made effective as of a prior date but relat-

90

ed the transaction to the discontinuance of the Nasco operations the date of which he also did not recall. Williams did not recall the transaction and nothing occurred during the trial to refresh his memory.

The evidence establishes that no definitive conclusion was reached until about December 3rd.

In addition to the takeover authorized by the resolution, defendants rely on the activities in the American Cities "B" stock after October 31st. These relate to purchases and sales during November. The defendants point to entries of purchase and sales of the "B" stock for the month of November in Central States' books as indication that Central States, commencing on November 1st, regarded itself as owner of the shares and did, in fact, take over the account by exercising rights of ownership. Central States' trading account for November contains an opening entry showing the receipt of 57,880 shares of American Cities "B" on November 1st, and thereafter almost daily entries of purchases and sales out of that account. But the evidence establishes that Nasco, and not Central States, made the purchases and sales during that month.

The Nasco purchase and sales sheets for the month of November 1929 record the very purchases and sales of American Cities "B" which ultimately were recorded in Central States' purchase book and the Central States trading account. Under Central States' normal bookkeeping procedure, individual slips would have been issued for each purchase and sale transaction. Contrary to this usual procedure, no individual sales or purchase slips were made or issued by Central States in connection with American Cities "B" stock transactions in the month of November. But on December 4th a Central States summary sales and a summary purchase slip, reflecting the combined total of the individual purchases and sales during November, were issued by Kilmarx. Each was dated "12/4/29 as of 11/31/29" (sic) and each summarizes respectively the total sales and purchases of American Cities "B" made during the month of November by Nasco.

The defendants claim that the mechanics of the transfer of the book entries and the issuance of the summary slips and other related facts sustain their position that Central States took over the account as of October 31st, 1929. But the inference is equally permissible, in fact on this record more compelling, that the purchases and sales during November were, in fact, Nasco's; that it, Nasco, was still actively engaged in dealer distribution throughout the entire month; and that the transfer to the books of Central States carried out the decision reached at the end of November or early December and approved by the Board on December 3rd. This explains a single summary purchase and a single summary sales slip executed in the early part of December following the November transactions, contrary to Central States' usual procedure.

The defendants place great store on Williams' intention to discontinue Nasco, and specifically urge two items in this connection. One is the legal change of name of Nasco on October 29th, to permit the incorporation of a new company, to be known as New Nasco, in which Goldman Sachs Trading and Central States were to be equally interested, for the purpose of engaging in dealer distribution activities. The New Nasco was incorporated on October 29th, the same day that old Nasco's name was changed to Columbia Utilities. Second, there is the basic agreement amongst Central States, Goldman Sachs Trading, the old Nasco and New Nasco, executed on January 1st, 1930, which contains a "Whereas" clause reading: "Whereas, the business of distributing securities has been carried on in the name and for the account of North American Securities since October 29, 1929 * * *." Separate and apart from the self-serving nature of the "Whereas" clause, made long after October 31st, the New Nasco did not begin its activities at the earliest until January 1st, 1930. New Nasco was delayed by a survey of Blue Sky Laws, which was not completed by counsel until November 20th. The plan for the formation of a New Nasco sponsored jointly by Goldman Sachs and Central States was first contemplated in

the late summer of 1929 and it is unlikely that pending activities by the newly formed Nasco, Williams would have abruptly discontinued the old Nasco.

There are other circumstances which indicate that the takeover was effective the date of its authorization by the Board and not prior thereto.

The Treasurer's report, signed by Kilmarx, for the period from October 31st to November 27th, which normally reflected the acquisition and disposition of the stock during the period of the report, omitted any reference to the acquisition of the 57,879 shares. Nor is there any reference in the report to purchases and sales by Central States of American Cities "B" stock in the month of November, those finally recorded by means of the summary sales and purchase slip. It is true that the accountants issued a tentative report as of November 30th, showing the acquisition of the 57,879 shares and also the result of the purchase and sales transactions for the month of November, carried on by Nasco allegedly for Central States, but the force of this is weakened when it is pointed out that it was forwarded to Central States on December 3rd. No satisfactory explanation has been offered why the takeover is as of October 31st and the action of the Board on December 3rd, 1929. Stone, when specifically asked to account for the lapse of time, had no explanation.

The fact that the resolution of the directors authorizes the takeover of the Nasco position "as of 10/31/29" instead of referring to an agreement made on October 31st, 1929; the purchase slip for the acquisition of the 57,879 shares on December 4th, again "as of October 31st"; the summary sales and the summary purchase slips each dated "12/4/29 as of 11/31/29" (sic) covering sales and purchases admittedly made by Nasco in November; the transfer of the November transactions at the end of November or early December from the books of Nasco to Central States; the omission in the Treasurer's report of November 27th of the 57,879 shares, then in Central States' portfolio[17a] with the precise

amount having been known since at least October 31st; the fact that the New Nasco did not begin operations until January 1st, 1930; all lead to the conclusion that no agreement was made on or prior to October 31st either to take over the then known 57,879 shares or the unknown number in the hands of dealers at the $25 market price prevailing that day, and that Nasco did not discontinue its activities until the end of November or early December 1929, and that no arrangement for any taking over was made prior to the period between November 27th and December 3rd.

 On the evidence before me, I do not find it unfair to Central States for Central States to have taken over Nasco's position in American Cities. Central States' large holdings would appear to have dictated that course in its own interests. But the terms of the takeover were unfair to Central States.

When the deal was fixed by the action of Central States' Board the market price was $18 per share and the approval of the transaction as of a prior date gave Williams an unfair edge and advantage of $7 a share based on market price—let alone—the actual price Nasco might have received if in December 1929 Nasco had tried to market elsewhere so large a block of American Cities stock.

It is no answer to suggest, as the defendants argue, that Nasco's activities were of benefit to Central States. Nasco was engaged in a private enterprise, and was not acting as agent for Central States. Whatever latitude Central States might have had in dealing with unaffiliated third parties, and however free a corporation may be in an arm's length transaction to take into account considerations not legally binding which may prompt it to be generous or "fair," in dealing with a controlling stockholder who dominated its affairs and activities, such a corporation cannot act with the same freedom. This precluded Central States from paying on a deal made in December the higher price which prevailed in October.

17a. The shares were held by Central States as collateral for cash loans to Nasco.

In participating in and passing upon and ratifying the transaction, the defendant-directors, Kilmarx, Stone, Freeman and Fogarty, acting under the domination of Williams, failed to exercise due care or prudence in the discharge of their responsibilities to Central States and acted contrary to the interests of Central States and are, therefore, jointly and severally liable with Williams.

Plaintiffs are entitled to recovery against them on this transaction in the sum of $491,-365, being at the rate of $7.00 per share, with interest from the 4th day of December 1929, subject, however, to consideration of the defense of statute of limitations.

### Transaction "D"

■ This transaction relates to purchases and sales by Central States of its own convertible preferred stock. Plaintiffs claim that the purpose of this operation was to maintain the market price of Central States common for the benefit of Williams, who was then engaged through Nasco in buying on the market and distributing through dealers large quantities of Central States common. They seek to recover from Williams and Freeman, Fogarty, Kilmarx and Stone, directors at the time of the transaction, the sum of $9,055,426.56 (the net amount expended by Central States). The defendants assert that the purchases were made for valid purposes and in Central States' own interest.

Commencing in 1928, when Central States embarked upon the expansion program, the third phase of its activity, it sold two issues of convertible preferred stock known as the 1928 and 1929 series respectively. The provisions of the two series were substantially the same. The stock was convertible into common. In March 1929 (before the issuance of the 1929 series) Central States paid a 100% stock dividend on its common, and in June 1929 (after the issuance of the 1929 series) it paid a 200% common stock dividend. The conversion feature of the preferred stock contained an adjustment formula which gave effect to the common stock dividends.

The two series contained other features in addition to the conversion privilege. Each share of preferred was redeemable at Central States' option at $110 on thirty days' notice, but the shareholder for a period of twenty-five days after the notice of redemption, had the power to convert into common. The preferred stock also provided for quarterly dividends in common stock, or at the option of the holder, in cash, at the annual rate of $6.

The right of conversion into common stock created a definite price relationship between the two stocks. Generally, the price of the preferred stock would rise to the market level of the common available upon the conversion. When the prices of the stocks were in balance it was considered parity. However, the correlation was not exact and at times the preferred stocks sold at prices below their common stock equivalent or parity price. At other times, when preferred was bought in volume in anticipation of a rise in the common stock, the preferred stock sold at more than their common stock equivalent. It is apparent that when the preferred sold below the market value of the common stock available under the conversion feature, there was an advantage in converting.

As the market price of the common increased, the dividend return to the holder of the preferred increased, and his conversion privilege had greater value.[18]

The lag of the preferred below the level of its common stock equivalent—parity—created an opportunity for professional arbitragers. They would buy the preferred and simultaneously sell the common short. They would then convert the preferred into common and make delivery of the common stock received upon the conversion. The profit to the arbitragers was the dif-

18. In this matter we are not concerned whether or not the market value of the stock dividend necessarily reflected true earnings of the corporation. To the owner it represented cash income if sold at the market, which frequently at that time was far in excess of the earnings of the corporation.

ference between the price paid by them for the preferred and the amount received by them upon the sale of the common.

An obvious result of conversions, whether by professional arbitragers or preferred stockholders who sought to benefit by the price differential whenever the preferred sold below its common equivalent, was to throw additional shares of Central States common stock upon the market. This is the nub of the plaintiffs' contention. They argue that Central States was compelled to undertake the purchase of substantial amounts of its convertible preferred stock to protect Williams who, through Nasco, was engaged in extensive trading operations in the common stock of Central States.

It was Williams, who instructed and authorized Kilmarx to undertake and supervise the program. The repurchasing program had not been authorized in advance by the directors but they knew of the daily transactions and the treasurer's reports revealed the pertinent facts.

By July of 1929, Central States had outstanding 110,000 shares of its 1928 series of convertible preferred and 115,500 shares of its 1929 series. Central States began to deal in the convertible preferred in February 1929, and its activities continued until the end of October 1929. During this period it purchased 48,380 shares and sold 25,633 of the 1928 series, and purchased 33,400 shares and sold 4,968 of the 1929 series. The net purchases of both series amounted to 51,179 shares at a net cost to Central States of $9,055,426.56, the amount sought to be recovered from Williams and the directors.

During the same period that Central States was purchasing and selling its preferred stock, Williams, through Nasco, was purchasing on the market and selling off the market through the dealer distribution system Central States common. Nasco's concentrated activities in Central States common coincided generally with Central States' operation in preferred, particularly in June and July of 1929, the peak period of activity for both. Williams, directly or indirectly, in his market operation in the year 1929, purchased over $32,000,000 of Central States common and distributed over $27,000,000, with heaviest purchases and sales from May to October.

In June and July 1929, the market price of Central States common had risen from $25 to $80 per share, reflecting an increase in the market value of Williams' holdings by almost $400,000,000.

Kilmarx, who was in charge of the day to day operations, bought the convertible stock only when the market price was under the equivalent price of the common stock. The purchases, coinciding with the rise in the market price of the common, prevented the common from being sold short against the conversion which would follow.

Central States, however, did not confine its activity solely to purchases; it also sold, but only when the price of the preferred was equal to or higher than the price of the equivalent common. In fact, Central States was here engaged in a sort of reverse arbitrage. When the preferred was over parity, there was no danger of conversion. Kilmarx conceded that had not the preferred gone over parity, the convertible stock purchased by it would have been retained by Central States and there would have been no trading activity—just purchases.

Central States' trading activities from May through August 1929, resulted in a profit on consummated transactions of more than $1,700,000. This was wiped out by the market crash in October. Central States then had a balance of 51,179 shares on hand. Eventually, the cost of the 51,179 shares was written down to the par value of $100 each and the difference was charged to capital surplus which resulted from the transaction described under "J."

Plaintiffs contend that the operation was not in the interest of Central States, and that the purchases involved the use of Central States funds and facilities for Williams' benefit and his personal purposes. They point to the fact that during the time Central States was buying and selling the preferred stock, it did not buy any of its common stock and, hence, the activity had no corporate purpose for the protection

of Central States. They reject the contention that one of the purposes of the transaction was to retire the preferred thereby making available additional common stock for future sales at a higher price. They also seek to mitigate the force of the defendants' argument that the preferred was purchased for retirement by showing that the defendants made no attempt to retire another issue of preferred, also redeemable, but without a right of conversion.

The defendants contend that the purchases were made for valid business reasons in Central States' interest; that the purchases both protected the corporation against arbitrage activities and at the same time Central States made and sought to make a profit by buying and selling.

In essence, these are the reasons advanced:

1. A profit purpose through the trading activity; 2. Profit prospects on both common and preferred based upon general optimistic attitude and the bull market; (a) it was desirable to retain (by preventing conversions) as much of the common stock as possible for future sales at higher market values; (b) it was desirable to purchase the preferred for future market sales, again in the belief that the market would continue to rise; 3. Protection of the corporation against professional arbitragers. It is claimed that their short selling resulted in an erratic market which was detrimental to the corporation because it impaired its prestige and endangered future prospects for the issuance of securities which were then contemplated as part of the expansion program. Investors, it is claimed, looked with more favor on stocks which were fairly stable.

So much for the business reasons relied upon by the defendants. But they also seek to rebut the plaintiffs' arguments and bolster their own position by pointing out that even if the 51,000 shares had been converted, it could have had no significant effect upon Williams' holdings or Nasco's dealer distribution program. The common stock equivalent of 51,000 preferred shares upon conversion was approximately 185,000 shares, and the daily purchases

of the preferred were not substantial enough in relation to the total outstanding stock in the market to have made any appreciable difference. Furthermore, Nasco was buying on the market to supply heavy dealers' demands and was generally paying a price higher than that at which the dealers' orders were placed. Consequently, they say, a lower, rather than a higher, market price and a greater, rather than lesser, supply of common on the market was to Williams' interest. They also rely upon the fact that there were very substantial conversions in 1929—464,241 shares of common stock were issued on conversion. In addition, it is argued that the resales by Central States of the convertible previously repurchased again placed these shares on the market with the conversion privilege. All these are urged as negativing the charge that the purchasing program was intended for Williams' benefit.

Several of the reasons now relied upon by the defendants were not advanced when Williams, Stone and Kilmarx testified before the SEC in 1937. The trading profit purpose seems to have been urged for the first time upon this trial and so, too, the suggestion that because of the prevailing optimism about the market there was likelihood of future profit by retaining the common shares which would have been released upon conversion, for future sales in a higher market. At the SEC hearing Williams claimed that the purpose was to prevent arbitrage and conversions, although it may well be that he did not fully develop the underlying reasons.

Assuming that the original purpose was principally to prevent conversions and that Williams necessarily benefited, the Court may not ignore the contemporaneous facts of the transactions in considering the fairness of the program to Central States, and whether or not Central States was overreached. First, the fact is that the corporation did trade in the stock. Out of the total of 81,780 shares purchased of both series, it resold 30,601 shares, leaving the balance of 51,179 shares, the subject of this action. To the extent that it sold 30,601 shares, it made possible conversions into common, although it must be acknowl-

edged that with the parity price of the preferred at or in excess of the common at the time of such sales, there was no likelihood of immediate conversion. Nor may the fact be ignored that as a result of its trading operations in a comparatively short time, from May to August 1929, a profit of $1,700,000 was realized which, to be sure, was completely dissipated by the collapse of the market in October 1929. Nor may we disregard the fact that prior to the crash and during the period of the purchase of the preferred, the market value at all times exceeded the net cost—and at one point in August 1929, by more than $6,200,000.

Weighing these facts against the claim that the basic purpose of the transaction was to benefit Williams at the expense of Central States by preventing conversions to avoid the dumping of common stock on the market, the Court is not satisfied that, upon the entire case, such is the fact. That Williams may have been an incidental beneficiary of the purchases does not, in and of itself, justify a finding that the program was unfair to Central States or reflected a breach of trust by fiduciaries.

The evidence establishes that through the years Central States, by reason of its stock dividend policy, was justified in seeking to maintain a stable market so that investors would be free to dispose of stock dividends received by them in a normal rather than in an irregular and erratic market. Also, the maintenance of a favorable climate for future issues contemplated under the expansion program represents a legitimate corporate purpose. Under the circumstances, the prevention of arbitragers' activities which tended to create a hectic market, would appear to be in the interests of Central States. This record does not justify a finding that the reason for the program was to advantage Williams at the expense of Central States or that the program was not undertaken in the interests of Central States.

The defendants are entitled to judgment dismissing the complaint upon the merits.

## Transaction "L"

This transaction relates to the sale by Central States to Nasco of 40,000 shares of North American Company stock at $46.13928 per share. The lowest market price on the day of sale was $50 per share. Plaintiffs seek to recover the difference of $154,428.80. Those named in this transaction, in addition to Williams, are Fogarty and Kilmarx.

During 1927, Nasco's dealer distribution activities were confined to North American common stock. To maintain an inventory position to meet dealers' demands, Nasco, from January to May 23rd, 1927, borrowed from Central States 60,000 shares of North American common. It had returned 20,000 shares and owed Central States a balance of 40,000 shares. These are the subject matter of this transaction. At the time of this transaction, Nasco was oversold by 80,000 shares and needed stock to cover its short position. Instead of returning the balance of the shares due to Central States, Central States on May 21st, 1927 sold to Nasco the 40,000 shares at $46.13928, the net price at which Nasco had sold the North American stock after taking into account purchases and sales. The lowest price on the market for North American common on that day was $50. Central States' journal records the sale, as well as a book profit of $419,011.75 on the sale, as follows: "To record as of May 21, 1927 sale of and profit on 40,000 shs. North American Company Common Stock at an average price of $46.13928 per share as per statement on file. Approved by directors at meeting held on June 7, 1927."

The minutes of the Board meeting on June 7th, 1927, recite (1) that Nasco "through their dealer distribution, had sold during the period to May 21, 1927, in excess of 40,000 shares of the Common Stock of the North American Company, at an average price of $46.13928 per share, in accordance with statement submitted"; (2) that Central States had advanced North American Company stock, in excess of 40,000 shares since January 1927; and (3) "it being necessary to realize on its (Central's) stock holding for the Company's corporate purposes" it was "Resolved, that the Central States Electric Corporation adopt the sale of such 40,000 shares of North American Company Common Stock as set forth

above, at a net price of $46.13928 per share as its action."

The statement referred to in the resolution was prepared by the accountants based upon all the sales and purchases made by Nasco of North American stock. Following the computations appears the legend, "Of the above stock 40,000 shares sold for the account of Central States Electric Corporation."

Plaintiffs point to this last item and also to a preliminary draft of a resolution not used, which contains similar language, as another attempt to hold Central States as principal (as in "C" Transaction). There can be no question upon this record that the distribution was at all times carried on by Nasco for its own account. The defendants make no contention to the contrary.

The simple issue here is whether a sale imposed by a fiduciary upon a beneficiary requiring it to sell at less than the market value may be considered fair.

The defendants seek to justify the transaction on the ground that Nasco, having suffered heavy losses in the dealer distribution of North American, contemplated discontinuing its activities and that it was to Central States' interest as the largest holder of North American common that such activities be continued. Accordingly, they urge that as an inducement to Nasco the sale at the price below the market was, under the circumstances, fair. Parenthetically, it is observed that it was the proposed discontinuance at the end of October 1929 of Nasco's activities which was the asserted justification for the takeover of the 70,000 shares of American Cities "B" on December 4, 1929 "as of October 31st," discussed under Transaction "C." But this was May 1927.

There is a complete absence of credible evidence in the record to support this contention. Central States was entitled to the return of either the balance of the 40,000 shares of North American stock owing to it from Nasco or payment therefor at the market price on May 21st. It is true that Central States was interested in a stabilized and broadened market and that a wider distribution of the stock was to its advantage. But the irrefutable fact is that the dealer distribution activity of Nasco was essentially for its own account. That Central States was an incidental beneficiary of Nasco's activities does not justify depriving Central States of the fair market price of the stock on the day the common directorship compelled it to sell below the market. North American Company and other Williams' companies were just as much interested in the dealer distribution activity. The distribution here was of North American Company stock and the North American Company would appear to have been a more direct beneficiary; its interest is evident from the fact that North American contributed to Nasco $150,000 per year to support its activities. Taking defendants' contention at face, there is no proof of any commitment or agreement on the part of Nasco to continue the stabilizing activities.

There is apparent contradiction between the positions taken by the defendants in this and in the "B" transaction. Here the defense's position is the reverse of that urged in that transaction. It was there contended that Central States' basic policy was to retain the North American stock and to extend its holdings, although it had debts and found it necessary to sell debentures amounting to $25,000,000 as well as other securities to raise cash required for investment in the Blue Ridge Corporation. Here, too, we are dealing with North American. We find Central States selling 40,000 shares of North American below the market to Williams, and recording on the minutes that it was necessary "to realize on its stock holdings for the Company's corporate purposes." Whatever may have been the reason for the sale, it appears that the consideration was not adequate. Geddes v. Anaconda, 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425. The directors' duty was to obtain the best possible price for the stock. The transaction does not have the fairness required of a trade between Central States and its controlling and dominating stockholder.

In participating in and passing upon and ratifying the transaction, the defendant-directors Fogarty and Kilmarx, acting un-

der the domination of Williams, failed to exercise due care or prudence in the discharge of their responsibilities to Central States and acted contrary to the interests of Central States and are, therefore, jointly and severally liable with Williams.

Plaintiffs are entitled to recovery against them on this transaction in the sum of $154,428.80 with interest from the 21st day of May, 1927, subject, however, to consideration of the defense of statute of limitations.

### Transaction "E"

■ This transaction took place during the fourth phase of Central States' affairs, when its principal activity was the ownership of stock in other companies such as the North American Company, American Cities Power and Light Corporation, Blue Ridge and Electric Shareholdings. Recovery is sought against Williams and Kilmarx, Johnson, McCornack, Eccles and Finney who were directors at the time of the transaction.

In 1938, when the registration provisions of the Public Utility Holding Company Act had been held constitutional,[19] Central States owned directly, and indirectly through wholly owned or affiliated companies, 16% of the common stock of the North American Company. To avoid being subject to the registration requirements of the Act, Central States decided to reduce its holdings in North American to below 10%. To achieve that result it was necessary for Central States to dispose of a substantial part of its stock in Electric Shareholdings which owned considerable North American stock and also for American Cities to sell some of its North American stock.

On November 18th, 1938, Central States and American Cities agreed with Tri-Continental Corporation and Selected Industries Incorporated that, insofar as Central States was concerned, Central States was to exchange 594,432 shares of Electric Shareholdings common for 891,648 shares of Blue Ridge common, the exchange being at the rate of one share of Electric Shareholdings for one and one-half shares of Blue Ridge. A concurrent and another intended result of the exchange was that stock control of Blue Ridge was transferred to Central States and stock control of Electric Shareholdings was transferred to the Tri-Continental group.

Central States did not exchange all of its stock in Electric Shareholdings and the reason assigned is that the amount was limited by the number of shares of Blue Ridge which Tri-Continental and Selected Industries had available for exchange.

The transaction with Tri-Continental is not questioned. What is attacked is another transaction made on the same day between Central States and New Empire Corporation and Onondaga Corporation,[20] two of Williams' wholly owned corporations. Central States exchanged with those companies a total of 23,400 shares of Blue Ridge for 15,600 shares of Electric Shareholdings. The rate of exchange was the same as in the deal with Tri-Continental. Both transactions were approved by the directors at a Board meeting on November 21st, 1938.

The gist of plaintiffs' charge is that Central States' corporate policy, as evidenced by its contract with Tri-Continental, was to dispose of Electric Shareholdings and acquire Blue Ridge; that at or about the same time, inconsistently with the purposes of the Tri-Continental deal, Central States was forced by Williams to give up Blue Ridge and acquire Electric Shareholdings. The motive ascribed for this alleged reversal of policy is that it was to relieve the Williams' companies of their Electric Shareholdings since Williams did not want to be placed in minority position with Tri-Continental, which, as a result of the transaction would acquire control of Electric Shareholdings.

19. Electric Bond & Share Company v. SEC, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936.

20. Another wholly-owned Williams corporation as to which a motion to dismiss the complaint herein was granted on the ground that the corporation had been dissolved and was not amenable to suit.

The defendants assert that tax saving reasons in the interest of Central States motivated the exchange with the Williams' companies. It appears that for some time prior to the transaction, Central States had been purchasing its own debentures at a discount and retiring them. The question as to whether the difference between the face amounts of the debentures and the prices paid for them constituted taxable income to Central States was not free from doubt and defendants claim that it was desirable, pending clarification of the issue, for Central States to establish counterbalancing tax losses.

Johnson, then a director of Central States and soon to be its President, and also a director of a number of Williams' wholly owned companies knew that the Williams companies held stock of Electric Shareholdings. In an effort to avoid the possible tax consequences of the debenture retirement program, Johnson suggested the exchange with the Williams' companies. His plan was that the 15,600 Williams' Electric Shareholdings stock be included in the block transferred by Central States to Tri-Continental, thereby enabling Central States to retain an additional 15,600 of its highest tax base stock of its remaining Electric Shareholdings for sale against possible taxable profit resulting from the debenture purchase program. This is the principal justification for the exchange with Williams.

Plaintiffs urge that the tax saving motive is sheer afterthought, and as potent evidence that Johnson's story is contrived, rely upon the fact that the certificates of stock acquired from the Williams' companies were not included as part of the total exchanged with Tri-Continental—an essential element if the tax consideration was in fact the reason. Johnson attributes this to the failure of his subordinates in Central States' accounting department to follow his specific instructions, which he assumed without checkup, would be faithfully executed.

If, in fact, the tax program was the motivating consideration for the exchange with Williams, it must be conceded that it was in Central States' interest. Thus, the determination of the issue in this transaction turns on acceptance or rejection of the testimony supporting the justification for the directors' actions.

Johnson's oral version of what he intended to accomplish receives some support from a contemporaneous document in his handwriting. Johnson prepared for the directors statements showing which blocks of stock were available for delivery to Tri-Continental and which were to be delivered, and calculated the resultant loss upon the exchange. The calculations indicated various blocks of stock and their cost basis. Included in the computation are the 15,600 shares acquired from the Williams' companies. That the tax matter generally was under consideration is further evidenced by a memorandum sent by Johnson the day following the transaction, November 19th, 1938, to the tax counsel representing Central States.

The record satisfies me that a principal factor in the exchange between Central States and the Williams' companies was the tax offset program and so it cannot be considered unfair to Central States. The Williams' companies obtained no tax or market advantage from the sale of the Electric Shareholdings stock to Central States. Marketwise, this transaction offered no advantage to Williams. The market price of Electric Shareholdings, for a considerable time after the transaction, was higher than the value Williams received through the exchange for Blue Ridge.

I find that the transaction was in the interests of, and was not unfair to, Central States. The defendants are entitled to judgment as to this cause of action.

### Transaction "I"

In this transaction the plaintiffs charge that a retroactive modification of the New Empire management contract compelled Central States to pay an additional $102,328.44 after it had already paid and fully discharged its obligation under the contract. Named as defendants in addition to Williams, are directors Kilmarx, Stone, Fogarty and Freeman.

Under the management contract made in February 1923, New Empire undertook to

supervise Central States' business, to make available its entire organization and to render all required services to Central States. By an amended agreement, Central States was to pay $18,000 per annum in monthly installments of $1,500. The contract permitted either party to terminate it upon thirty days' notice. No such notice was given by Central States or New Empire at any time. The payments were made regularly until the end of December 1928 and no issue arises up to that time.

Commencing January 1929 and through September 1929, Central States continued to make the regular monthly payments of $1,500 each to New Empire. In June 1929, the defendant Stone entered Central States' employ and was elected President at a salary of $50,000 per year. His salary of $4,166.66 each month from June through September 1929, was paid by Central States, although New Empire under the management contract was obligated to "furnish at our (New Empire) expense a President * * *" and other officers. On October 8th, 1929, after these salary payments had been made, the Executive Committee of the Board of Directors of Central States by corporate resolution approved the following arrangement: "The President reported that arrangements had been made under which indirect administrative overhead expenses incurred for the common benefit of this Corporation and several of its associated companies shall be shared by the several companies in proportion to the amount of their respective resources as adjusted from time to time by the officers, in their discretion, to give effect to variations in the value of assets and to exclude inter-company holdings. He further stated that this arrangement was being made retroactive to January 1, 1929."

The controversy centers about this resolution and its retroactive provision.

After the passage of the resolution, Central States paid $85,661.79 to New Empire as its share of the "arrangement" for the first nine months of 1929. Recovery is sought of this sum and also the four salary payments to Stone, in all, $102,328.44. The claim covers only the period for which the arrangement was retroactive, January 1st, 1929 to September 30th, 1929. Plaintiffs contend that the payments were without consideration since Central States had the right to performance by New Empire of its obligation under the unexpired and uncancelled contract, that Central States had paid in full its commitment under the contract, and that the retroactive provision foisting upon Central States additional payments beyond its commitment was unfair to it and a breach of fiduciary obligation by defendants to Central States and was made solely in New Empire's interest and at the expense of Central States.

Upon the trial, counsel representing two defendant-directors acknowledged that the issue was one of retroactivity but urged that the transaction was fair in view of New Empire's increased expense. Counsel for Williams dissented, urging that two contracts were in effect: (1) a quasi-contractual obligation for additional services, not contemplated under the original agreement, and that the retroactivity referred only to this item, and (2) the express contract, the management contract, of 1923.

The position finally urged by the defendants is (1) a quasi-contractual obligation to pay for additional or extra services brought about by Central States' expanded activities—services which were not contemplated under the 1923 agreement, and, (2) the 1923 agreement was cancelled by conduct of the parties—there was a "practical abrogation of the old understanding" commencing about January 1929 —or sometime thereafter, but, in any event, prior to October 1929, when the resolution was passed with its retroactive provision.

The evidence does not sustain either theory. It is clear that the directors at all times, and certainly up to October 8th, considered the contract in full force. Kilmarx and Freeman both testified to this effect. Kilmarx said that at the time the readjustment was made the management contracts had not been cancelled and no notice of termination had been given prior thereto. Freeman testified that up to the time of the passage of the resolution he regarded the management contract under

which Central States was paying $18,000 per annum as binding.

Other evidence independently establishes that there was no termination of the contract. The checks issued by Central States to New Empire at the rate of $1,500 per month, the stipulated amount under the management contract, for the period from January through September 1929, all described the payments as "management fees" for the particular month, and were so recorded on the books of New Empire until reversed following the passage of the resolution of October 8th.

The defendants point to the four monthly salary payments made by Central States to Stone for June, July, August and September 1929, as proof that Central States no longer regarded the New Empire contract in force. But these checks were drawn by New Empire's officers, who were also officers of Central States. There is no credible evidence to support the claim that these payments indicated any binding understanding that the management contract was no longer to continue.

The attempt to bolster the claim of cancellation by the very payments, the propriety of which depends on cancellation of the contract, is hardly persuasive. It may be argued more persuasively that the monthly payments by Central States from January to September 1929, of the $1,500, clearly marked "management fees" was recognition of the continued existence of the contract. The monthly payments were in conformity with a written agreement, whereas the salary payments were in violation of its provisions.

Nor does the evidence support the theory that "an additional obligation was incurred by Central States for which it was bound to pay by reason of having changed the character and extent of its business from that covered by the 1923 agreement."

The nature of the services which New Empire rendered to Central States did not vary from that specified in the agreement, although it may well be that because of newly formed affiliated corporations its extent did. Although the matter had been under consideration earlier, no conclusion was reached as to the method of allocation until shortly before the October 8th meeting. Kilmarx, who had been consulted as to methods and information, first heard of the new formula, which was based on resources of the various companies, in the Fall of 1929, shortly before the adoption of the resolution.

The question is not the fairness or unfairness of the management contract to New Empire or the fairness of the new arrangement prospectively. New Empire had the means to end the contract if it proved burdensome. The issue is the propriety of making the new arrangement retroactive. In an arm's length relationship a retroactive arrangement might well be supported by the business judgment doctrine. But the relationship here was of a different order. Central States never had any independent representation. The oft-quoted rule of Meinhard v. Salmon [21] is particularly applicable to this transaction, as it is to others already considered. "Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions * *." Where there is a valid contract between fiduciary and beneficiary—and such was the management contract—the fiduciary will not be permitted to deprive the beneficiary of its fruits and impose, by means of retroactive arrangements, a burden beyond those contained in the agreement. This would open the door to limitless opportunities to overreach and defraud the beneficiary. Only a clear showing that the retroactive arrangement was in the interest of the beneficiary and not intended for the benefit of the fiduciary, can permit it to stand. This is not such a case. On the contrary, it is a clear case where Williams, acting through New Empire, "placed himself in a position in which his personal interests were, or might be antagonistic to those of his trust. * * * The course taken was one which a fiduciary could not legally pursue." [22]

21. 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1.

22. Jackson v. Smith, 254 U.S. 586, 588, 41 S.Ct. 200, 201, 65 L.Ed. 418.

It is, on this record, the third transaction in which Williams, through wholly owned companies, sought to deny Central States its rights or benefits by "as of" arrangements.

In participating in and passing upon and ratifying the transaction, the defendant-directors, Kilmarx, Stone, Fogarty and Freeman, acting under the domination of Williams, failed to exercise due care or prudence in the discharge of their responsibilities to Central States and acted contrary to the interests of Central States and are, therefore, jointly and severally liable with Williams.

Plaintiffs are entitled to recovery against them on this transaction in the sum of $102,328.44 with interest from the 8th day of October, 1929, subject, however, to consideration of the defense of statute of limitations.

### Transaction "J"

■ This is the so-called "donation" transaction, referred to by one of Central States' directors as "a very unique * * * and also a highly complicated one"—as indeed it was. The defendants, in addition to Williams, are Central States directors, Stone, Kilmarx, Freeman and Fogarty, and Dulles, Weinberg and Catchings, who as directors of Shenandoah (Williams and Stone were the others) are charged with knowingly furthering Williams' purposes.

The substance of the plaintiffs' charge, disregarding for the moment the many involved steps which accompanied the transaction, is that the defendants caused Central States to sell to Shenandoah 375,000 shares of Shenandoah preference stock at a loss of $9,375,000, when in fact the stock was fully covered by assets, and to buy from Shenandoah common stock of Goldman Sachs Trading Corporation at the market value of $9,375,000.

The defense is that Central States suffered no loss, but on the contrary, the transaction, which was part of a series of transactions, resulted in a gain to Central States as well as to Shenandoah and Blue Ridge,

in which Central States had substantial interests and that the purpose of the transaction was, through the generosity of Williams, the rehabilitation of these corporations following the stock market collapse.

The defendants' version of the "donation" is as follows: After the stock market crash in 1929, Shenandoah and Blue Ridge had suffered tremendous losses in the market value of their portfolios. The surplus of Shenandoah had decreased by more than $37,000,000. Williams, who had become a director of these companies, contrary to his practice of never going on the board of a corporation which contemplated the public offering of securities, believed that the public had relied upon his association with Shenandoah and Blue Ridge as an assurance of their success. When market values dropped so soon after he had become a director, he felt a personal obligation to help, and decided to make "a very substantial contribution" to the portfolios of Central States, Shenandoah and Blue Ridge, or to one of them, in such manner as to help all. Williams did not believe that the depressed market was permanent, and believed that his act would revive faith in the market and stimulate recovery.

He communicated his idea to John Foster Dulles, whose law firm at various times had represented both Central States and Williams and who was then a director of Shenandoah. He also suggested to the Goldman Sachs group, that it make a similar contribution. Although warmly lauding Williams' proposal the group indicated it was not in a position to do so.

The mechanics of the transaction were set up by officers and directors of Central States in consultation with the company's accountants and lawyers. The form which the transaction took was largely governed by tax considerations. The following were the steps taken on or about December 6th, 1929:

(1) Williams transferred to Central States two blocks of Central States common, one of 418,995 shares [23] of the market value of $9,375,013, and the other consist-

---

23. This block was represented by 200 shares of Northernland Corporation, all

its capital stock, which New Empire had received from Northernland Corporation

ing of 1,300,000 [24] of the market value of $29,087,500. The total market value was $38,462,513.[25] No consideration was paid by Central States. The two blocks were delivered to Central States as a contribution to its capital surplus and upon the condition that Central States contribute them to the capital surplus of Shenandoah, and, that Shenandoah contribute one of the blocks (the Knickerbocker Corporation block of 1,300,000 shares of Central States common) to the capital surplus of Blue Ridge Corporation. These conditions were approved by Central States' Board of Directors and were carried out. They were but the first of a series of steps.

(2) Two contracts were entered into by Central States with Shenandoah. Under the first, Central States sold to Shenandoah its 375,000 shares [26] of $50 par value Shenandoah preference stock for $9,375,000 ($25 a share) the market value, and under the second, it bought from Shenandoah 234,-375 shares of the common stock of Goldman Sachs Trading Corporation for the same amount, $9,375,000, which represented the market value of the Trading stock. Thus, in net effect, Central States had the Goldman Sachs Trading Corporation common stock instead of its Shenandoah preference and had suffered a loss of $9,375,000 representing the difference between the par value of $18,750,000, which Central States had paid for the stock, and the amount which it received upon the sale. This is the heart of plaintiffs' claim: that Central States not only suffered an immediate loss of $9,375,-000, but also surrendered its senior or preferred position in Shenandoah, which was fully covered by assets.

(3) Goldman Sachs Trading Corporation also sold its 375,000 shares of Shenandoah preference to Shenandoah at the same price of $25 per share, for a total of $9,375,000, represented by 418,995 shares of Central States common (the Northernland block which had been contributed by Williams) having a market value of that amount. Trading took the same loss in the amount of $9,375,000 since it had paid the same price as Central States for the Shenandoah preference stock.

(4) Upon acquisition of the 750,000 preference shares from Central States and Goldman Sachs Trading Corporation, Shenandoah retired the stock. The difference between the cost of acquiring the shares, $18,750,000, and the aggregate par value, $37,500,000, resulted in an increase in its capital surplus of $18,750,000. There was thus achieved, in part, the purpose to restore Shenandoah's capital surplus.

(5) Williams' contribution was subject to the further condition that Central States apply, to the extent necessary, the addition to its capital surplus resulting from the contribution as an offset to any loss incurred by its market operation in its convertible preference stock, the subject of transaction "D." This had been suggested by Freeman and was not in Williams' contemplation when he first proposed his contribution. This condition, too, was met by Central States.

In final effect, by a series of involved bookkeeping and accounting entries, there was recorded on Central States' books an increase in its capital surplus of $14,995,-344.77. Simply stated, this was achieved by giving effect in Central States' equity ownership in Shenandoah and its indirect ownership in Blue Ridge, to the increased values resulting from Williams' contribution and to the elimination of the Shenandoah

---

upon transferring to it 418,995 shares of Central States common stock. New Empire then delivered the 200 shares of Northernland Corporation. to Central States.

24. This block was represented by 2,000 shares of Knickerbocker Corporation, all its capital stock, which New Empire had received from Knickerbocker Corporation upon transferring to it 1,300,000 shares of Central States common stock. New Empire then delivered the 2,000

shares of Knickerbocker Corporation to Central States.

25. The market value of each share was $22⅜.

26. In August 1929, upon the formation of Blue Ridge, Central States and Goldman Sachs Trading Corporation had each purchased 375,000 of the $50 par value Shenandoah preference stock, paying par, or $18,750,000, a total of $37,500,000. (See discussion under transaction "B").

preference stock. The $14,995,344.77 increase in capital surplus was applied as follows: $5,734,252 was deducted to absorb the loss on the convertible preferred referred to in the "D" transaction and the balance of $9,261,092 to offset the loss on the sale of the 375,000 shares of Shenandoah preference.

In another aspect of the transaction, the contingent obligations under the equalization agreement referred to under transaction "A" entered into by Central States and Goldman Sachs Trading, when Shenandoah was organized, were cancelled, with the approval of Central States' Board.

Plaintiffs deny that the transaction resulted in any benefit to Central States and claim that Shenandoah's surplus was restored at Central States' expense, that it was only a conduit for the transfer of the 1,718,995 Central States shares to permit Central States by artificial bookkeeping entries, to set up a capital surplus of almost $15,000,000 to write off the losses on the convertible preferred and the Shenandoah preference; that in fact the transfer to Central States of its own common stock for momentary retention transferred nothing of value to it and that its assets were not increased by a single penny.

The defendants urge that the donation was the most efficient way, considering tax problems, of shoring up the depreciated portfolios of Central States, Shenandoah and Blue Ridge; that it was in Central States' welfare to relinquish its preferred position since the entire system was benefited; and finally, there was no loss to Central States, but rather a gain through the substantial increase in the value of its direct and indirect holdings in Shenandoah and Blue Ridge.

The basic test is the fairness of the transaction to Central States as a beneficiary. Was the transaction one that an independent corporation dealing with Williams at arm's length would have made under the then prevailing conditions? In considering this question I do not believe that the transaction can be confined to a consideration of Central States' sale of its Shenandoah preference stock in return for common stock in Goldman Sachs Trading, separate and apart from the related steps of the entire program.

It is an undoubted fact that market values were devastatingly depreciated and that an attempt was being made to restore confidence and to stem the tide. Whether Williams' actions were inspired by a statesmanlike purpose as defendants suggest, or motivated by self-interest, as plaintiffs contend, the ultimate question is the fairness to Central States and the effect of the entire series of transactions upon it. This issue must be determined upon all the facts and circumstances at the time of their occurrence and not in retrospect.

We consider first the change of Central States' position as a stockholder in Shenandoah. Was it damaged by giving up its preferred position?

Central States and Goldman Sachs Trading each owned 375,000 shares of Shenandoah preference and each owned about 43% of Shenandoah's entire common stock. Each surrendered its preferred shares in exchange for securities of a market value of $9,375,000 and took a loss of $9,375,000. The securities of Northernland which Trading received from Shenandoah had been contributed by Williams. In result, Shenandoah succeeded in retiring $37,500,000 par value preference stock for $9,375,000 plus the Northernland shares of the same market value, which it had acquired at no cost. To the extent that Central States had priority over the common stock, as did Goldman Sachs Trading, it did yield its position, but does this render the transaction unfair to Central States?

Following the retirement of the preference shares, Central States' position remained in balance as against Trading since Central States continued to own 43% of the common stock, as did Trading. Their positions were identical; in the event of liquidation, they would share equally in the equity after the prior requirements were satisfied.

It is true that there remained outstanding in the hands of the public a substantial number of shares of the preference stock and 14% of the common stock. But the advantage to these outside interests at the ex-

pense of Central States and Trading does not necessarily brand the transaction as unfair, if we accept the thesis that the basic purpose of the donation of 1,718,995 shares was to restore values in Central States, Shenandoah and Blue Ridge in the interests of Central States.

The loss of Central States' preference position must also be considered in the light of the gain in its equity interests in Shenandoah and Blue Ridge, and in this connection we consider the second branch of the plaintiffs' attack—the loss of the $9,375,000 upon the sale of the preference stock. In this instance, too, the dollar loss cannot be considered *in vacuo* but must be balanced against the gain, if any, in Central States' equity position.[27] The propriety of the accounting method adopted to reflect the increase in capital surplus on Central States' books was defended by the defendant Freeman, a Certified Public Accountant, who testified that it was in accord with accepted accounting procedures.[27a] No counter testimony was offered. While the extent of the gain as a result of Williams' contribu-

tion may be the subject of dispute and the accounting procedures resorted to subject to differences of opinion, the undeniable fact remains, whether the bookkeeping entries were proper or otherwise, that 1,718,-995 shares of Central States' common stock, formerly the property of Williams, became the property of Shenandoah and Blue Ridge. Those shares had a value in the hands of Shenandoah and Blue Ridge. In the case of Shenandoah, 418,995 Central States shares (Northernland) were used as the equivalent of cash—$9,375,000—to acquire from Goldman Sachs Trading Corporation its 375,000 shares of Shenandoah preference. The 1,300,000 shares acquired by Blue Ridge had a market value in excess of $29,000,000. It is an exercise in semantics to suggest that the acquisition without cost of $38,000,000 market value of shares by two corporations in which Central States had such substantial interests reflected no increase in their asset positions. It must be remembered that upon its formation substantially half the assets of Shenandoah consisted of Central States common.

27. Various computations have been urged upon the Court—by the plaintiffs to prove that, in fact, Central States received nothing and there was no gain, and by the defendants, on the other hand, to show that by reason of Central States' direct and indirect holdings in Shenandoah and Blue Ridge there was substantial gain to offset the loss and also the preference position. For example, the defendants contend that from the 418,995 shares alone Central States derived a benefit of over $11,000,000. Their position is that Shenandoah's cost of retiring the 750,000 shares of preference of a total par value of $37,500,000 was only $9,375,000—the 418,995 shares (Northernland shares) which Shenandoah transferred to Goldman Sachs Trading for its 375,000 shares of preferred, having been acquired from Williams as part of the donation without cost. Consequently, they argue, that upon the retirement of the preference there was a gain in Shenandoah's equity of $28,125,000, of which Central States' indirect share was $11,-615,625. But plaintiffs charge that this is deceptive because Shenandoah failed to deduct its loss on the 234,375 shares of Goldman Sachs Trading which it turned over to Central States at its then market value of $9,375,000. These

shares had been acquired at a cost of $24,609,375, and they contend the maximum gain in equity cannot exceed the difference between $37,500,000, the par amount of the retired preference, and the $24,609,375, the cost of the 234,375 shares of Goldman Sachs Trading. Therefore, say the plaintiffs, if there was any indirect benefit to Central States it was not $11,615,625 but $5,285,156.

The SEC computed the alleged gain to the Central States system resulting from the donation of the 1,718,000 shares at $13,990,702 (Exhibit 200, B).

27a. These are attacked by plaintiffs as fictitious and artificial. They argue that temporary possession by Central States of the shares did not justify these entries on its books, relying upon the authorities which hold that treasury shares of a corporation's own stock are not present assets citing Borg v. International Silver Co., 2 Cir., 11 F.2d 147; consequently they urge that Central acquired nothing of value and that it could not create value by the subsequent transfer to Shenandoah and Blue Ridge. However in the Borg case the Court states that such stock can be resold on the market thus indicating that it has potential value.

The advantages and disadvantages to Central States in this transaction cannot be determined with exactitude, but considering the time, the circumstances, the chaotic market, the efforts to restore values and to achieve a stable market, the transaction cannot be held to be unfair to Central States.

I am satisfied under the attendant circumstances that the contribution was of value and of benefit to Central States, untinged by any overreaching of, or unfairness to, Central States.

The defendant Williams has urged the donation as an equitable offset against any claim upon which he may be found liable. There is no occasion to consider the provision which sought to grant him a release from liability under the "D" transaction as the Court has awarded judgment in favor of defendants on that claim. As to other claims, it is clear that the delivery of the shares was not intended to secure exoneration from liability nor do the facts warrant offsetting them against any other claim on which he has been found liable.

In respect of Transaction "J" all the defendants are entitled to judgment dismissing the complaint upon the merits.

### Transaction "K"

 This transaction in 1922 involves the sale by Central States of its holdings in Cleveland Electric Illuminating Company. The defendants are Williams and Clarence Dillon of Dillon, Read & Company. No recovery is sought against any director of Central States. The substance of the charge is that Williams and Dillon prevented Central States from selling its Cleveland Electric Company stock directly to the North American Company or one of its subsidiaries and instead interposed the Ashland Corporation which purchased the stock from Central States and immediately resold it to North American Edison Company, at an unconscionable profit of $729,800. Upon the trial the complaint was elaborated to include a charge that Williams owned 50% of the Ashland Corporation or was an "equitable" owner therein and thus benefited financially.

The transaction under attack was one of a series that took place on March 24th, 1922. On that date Central States owned 72,934 shares of Cleveland Electric Illuminating Company common stock and was entitled to subscribe to an additional 36,647 shares at $100 per share. The 72,934 shares were pledged with a trust company to secure an issue of notes payable on June 1st, 1922 of which $5,963,500 was then outstanding. Central States was without funds to meet the notes or to exercise its right to subscribe to the additional 36,467 shares.

On March 24th, 1922, Central States sold its 72,934 shares of Cleveland stock and the 36,467 shares for which it held purchase rights to the Ashland Corporation for $10,810,200 cash, and 60,000 shares of North American preferred stock valued at $3,000,000. Ashland then sold the same Cleveland stock and rights to the North American Edison Company, newly organized by North American Company as a wholly owned subsidiary, for $11,540,000 in cash and 60,000 shares of North American preferred. Thus, Ashland made a profit of $729,800, the amount in controversy.

To finance the purchase, North American Edison Company issued $14,000,000 principal amount of bonds which Ashland purchased for $12,040,000 and offered for public sale through a group of investment bankers and dealers headed by Dillon, Read & Company. The distribution of the bonds resulted in a profit to the group, but this is not in issue here.

The transaction was approved by Central States' Board at a meeting on March 24th, 1922.

Although there is a conflict in the testimony, the record establishes that the transaction was negotiated by Williams acting for Central States. Williams was the majority stockholder in Central States and up to the date of the transaction had been Chairman of its Board and of the Board of the North American Company. He resigned both positions on March 24th, 1922, the date of the transaction. The defendant, Clarence Dillon, had been a director of North American Company until he, too, resigned on March 24th. Williams and Dil-

lon were closely associated in the operation of the North American Company.

All of Ashland Corporation's stock was held by Eastern Corporation, which, in turn, was wholly owned by members of the Dillon Read firm and their families.

The plaintiffs urge that the reason for permitting Ashland to make the profit was that Williams had a substantial interest in Ashland and that he made a secret profit on the deal.

As evidence of Williams' financial interest, plaintiffs rely upon a letter from Ashland to Central States offering to purchase the Cleveland stock, which contains a statement that "Williams and his associates own substantially a half interest in Ashland." The letter is signed by Kennedy as President and R. E. Glass as Secretary. A second letter, identical as to the offer of purchase but without the statement as to Williams' interest, was forwarded to Central States with a covering letter by Loring H. Hoover, a lawyer associated with the attorneys for Central States, addressed to F. L. Dame, President of Central States, stating, "I assume you will want the substitute letter to be signed by Mr. Glass, as Secretary, and that you will return to me the original letter." The first letter was then returned to Hoover. The second letter is the one recited in the minutes of March 24th, 1922 recording acceptance of the offer by the directors.

Plaintiffs claim that the letter which refers to Williams' interest, which was not discovered until shortly before the trial, establishes Williams' interest as a half owner of Ashland. This is denied by the defendants, who insist that the second letter was for the express purpose of correcting the erroneous statement of Williams' ownership. Williams categorically denies ever having had any interest in the Ashland Company or that he received any proceeds of the sale or any part of the profit.

Other rebuttal testimony was offered. Kilmarx said the letter which was presented to the Board meeting on March 24th, and upon which the directors acted, did not recite any interest of Williams in Ashland; that he had never before seen or heard of

any offer which referred to any interest of Williams in Ashland; and as Williams' confidential aide in charge of his books and familiar with his personal affairs and holdings, he testified that Williams never had any financial interest in Ashland.

The plaintiffs stipulated that no payments whatsoever were made by Ashland to Williams; that all monies and assets of Ashland went to Eastern Corporation, the partners of Dillon Read or their families, or to outsiders other than Williams; and that the accounting records of Dillon Read, Eastern Corporation and Ashland would confirm this. One of the plaintiff-trustees, who had examined all the records of the transaction, stated he did not believe Williams received any part of the $729,000 profit.

While there has been no satisfactory explanation of the origin of the statement of Williams' interest in Ashland contained in the first letter, there is insufficient proof to establish the charge that Harrison Williams had any interest, direct or indirect, in Ashland or received any profit on the deal, directly or indirectly.

The Court cannot accept plaintiffs' suggestion that "Williams could have obtained his share of the profit taken by Ashland without receiving it directly in the form of dividend or other distribution on the stock." Not only is there a lack of any evidence to support the theory, but it would require the Court to base a finding on a speculative premise. So, too, the Court does not deem the reference in the minutes of North American Company to Williams' interest in the Ashland transaction as sufficient to uphold the charge. The reference there is consistent with Williams' interest in Central States, in which he was a stockholder, and as a result of which he would benefit upon the sale of the Cleveland stock.

Plaintiffs urge that even if Williams had no personal stake in the transaction, he is liable because he conspired with Dillon to interpose Ashland for the sole purpose of permitting him (Dillon) and those associated with him, to receive a profit of the $729,-800 at the expense of Central States. Dillon, Read & Company, an investment banking firm, of which Dillon was a partner,

had financed a number of Central States transactions through the sale and purchase of securities. Dillon had never been an officer or director of Central States. He was under no fiduciary duty to Central States.

It is clear that the sale of the stock had a legitimate business purpose in the interest of Central States. The amount of profit realized upon the sale cannot be used as a measuring rod to determine that there was a conspiracy between Dillon and Williams to overreach Central States. While a hard bargain may have been driven, Dillon and Ashland were free to bargain hard. The plaintiffs have failed to sustain the charge of the existence of a conspiracy between Williams and Dillon to effect the sale through Ashland for the purpose of conferring a special benefit on Dillon at the expense of Central States.

The defendants are entitled to judgment on this transaction.

## Transaction "M"

 Although labelled as a transaction, "M" differs from those previously considered. It is in reality not a transaction but a course of conduct allegedly followed by Williams and the officers and directors of Central States during the fourth phase of Central States' existence, from 1930 to 1942. During this period, which was unmarked by major transactions except for transaction "E," the composition of the Board of Directors changed completely. Of the four directors named in most of the transactions, Freeman, Fogarty, Stone and Kilmarx, who are among the defendants [28] named in this transaction, the first three resigned in 1934; only Kilmarx continued on the Board until after the petition was filed. Also named as defendants are the directors newly elected during this period.

Plaintiffs claim that Williams and the other defendants planned to conceal and did conceal the obligations and claims aris-

ing from the other transactions, with the purpose of preventing the institution within the statutory period of limitations of any lawsuit to recover on these claims. It is specifically charged that with this purpose in mind the defendants made a sham investigation of a minority stockholders' claim with respect to the circumstances relating to Transaction "D"; caused the corporation to pay interest on its debentures out of capital during the years 1931 through 1941; refrained from "seeking the haven of the Bankruptcy Court" and its attendant close supervision of the corporation's affairs; and caused the destruction of various records.

Overriding all of these specific contentions is the general charge that Williams continued his domination of Central States until the filing of the petition in February 1942. It is claimed that this domination alone tolled any statute of limitations but that beyond this, the conduct attacked in Transaction "M" is asserted as an alternative or cumulative basis for tolling such statutes until February 27, 1942, when the petition was approved. The soundness of this position will be considered hereafter in connection with the basic legal issue— the determination of the applicable statutes of limitations. The immediate question as to the existence of these circumstances will now be considered.

Proof was offered on four principal subjects:

1. The payment of interest on Central States debentures out of capital from 1931–1941.

The market break of 1929 collapsed market values of securities generally. In 1929, before the break, the market value of Central States' assets, which consisted of securities, was between $350,000,000 and $400,000,000. These values had declined to approximately $40,000,000 by 1931 and to about $17,000,000 in 1934. The figure rose to $37,000,000 in 1935, to $40,000,000 in 1936,

---

28. The complaint demands judgment against the defendants named in this transaction. This claim, however, has apparently been abandoned; plaintiffs' brief indicates that the transaction is asserted solely for the purpose of tolling the statutes of limitations. Upon the trial plaintiffs' counsel stated that this transaction was not designed to charge directors with any dollar liability for occurrences which took place after they ceased to be directors (SM 1379).

but by the end of 1941 declined to a low of barely over $1,300,000. This was shortly before the petition was filed.

During this period Central States' outstanding debentures at face amount far exceeded the market value of its assets, save in the years 1936 and 1937, when the total principal amount of the debentures was slightly under the total market value of assets. In 1936 the debentures totaled over $37,000,000, but by the end of 1941 were reduced to approximately $18,000,000 as the result of a program adopted in 1936 of repurchases of debentures at prices below face amount.

The interest requirements on debentures ranged from approximately $1,900,000 to $2,000,000 from 1934–1938 and thereafter decreased to $1,050,000 in 1941 by reason of the repurchasing program.

At no time during the period in question did Central States' income approach its interest requirements. Income from dividends was far below interest requirements except in 1936 and 1937 and even then, fell short by several hundred thousand dollars.

In only two years, 1936 and 1937, did the assets of Central States cover its outstanding debentures, and its earnings approach its interest obligations. Commencing in 1932, it was decided, since income was insufficient to meet the interest payments, to raise the necessary cash by the sale of assets consisting of portfolio securities. The same program was continued thereafter during most of the years up to 1941.

The plaintiffs claim that the payments of interest out of assets when earnings were insufficient and when the amount of outstanding debentures exceeded its assets at market value, were made not in the exercise of honest business judgment but as a part of a scheme to avoid the supervision of a reorganization court and to permit limitations to run on the claims here in controversy.

The defendants contend that the policy was sound business management justified by their long range optimism as to the value of Central States' assets. The interest problem first arose in 1931 when values had fallen severely. Cash dividend income was low because of decreased earnings in the companies whose stock Central States held, and the dividend income was further cut because of dividend restrictions contained in preferred stocks of these corporations.

Thus, the directors and officers were confronted with the problem of predicting the future. According to the defendants, they decided that although market values were considerably below underlying asset values, the "intrinsic values" or earning power of the operating companies in the system were potentially greater than the market values and they believed these "intrinsic values" would ultimately be realized. Therefore, they decided to preserve Central States so as to realize upon these values in the future. The policy of paying interest by selling off assets was selected as the means of preserving Central States. The repurchasing of the outstanding debentures for retirement, then selling much below par, was closely connected with the purpose to preserve the corporation by reducing its annual interest requirements. The program was carried out by Kilmarx, who was Central States' acting President from 1934 to 1938, and Johnson, who was President from December 1938 until after the petition was filed. The record shows that Williams took an active part in this policy. Kilmarx testified that Williams instructed and authorized him to sell assets to raise cash for interest payments. He testified to many conversations on this subject with Stone up to the time of the latter's resignation as President in 1934 and thereafter with other officers and directors. Johnson acknowledged that when he became President of the corporation he was told by Williams that his principal job was to devise means of meeting interest obligations and that he and Williams often discussed the sale of assets to meet the interest requirements.

The defendants contend that but for the market decline at the outbreak of the war in 1941, which they claim plunged Central States into bankruptcy, their judgment would have been vindicated. Plaintiffs claim that the policies adopted were part

of a scheme to avoid the scrutiny of a bankruptcy court and that the immediate cause of filing the petition was a letter in February 1942 from the SEC, stating that it would institute legal action unless steps were taken to reorganize or liquidate the corporation.

A conclusion that the interest payment policy was designed to protect Williams must rest on inference. The only direct evidence as to the motive appears in the testimony of the defendants. Thus, the matter basically hinges on the acceptance of the defendants' position that they exercised their experienced business judgment based upon their faith in the future of Central States and in the utility industry. There is no evidence of any purpose other than what may be inferred from the bare fact that assets were sold to meet interest payments.

The market rise in 1936 and 1937, with the resulting substantial increase in both assets and earnings, would appear in some measure to justify the decision made by the defendants. But thereafter Central States' fortunes dwindled rapidly. After 1937, year by year, there was a steady drop in the market value of its assets. At the end of 1941, shortly before the filing of the petition in reorganization, the market value of its assets as already noted was $1,312,000, slightly above its annual interest requirement of $1,050,000. The fact that after 1937 the market dropped does not permit the Court to draw an inference of bad faith based upon hindsight.

Moreover, although a petition for reorganization may be filed when the earnings of the corporation are not sufficient to meet its obligations[29] there is no requirement to do so. It is true that the continuance of the interest payment policy under these circumstances which persisted for more than ten years suggests bad judgment, but absent a clear showing of bad faith on the part of the defendants, the Court finds that the practice attacked was not designed to avoid reorganization for the purpose of protecting Williams. There was more than sufficient reason on the

face of it for the corporation to try to preserve itself and for Williams, as a substantial common stockholder, to want it to survive in the hope that a rising market would rehabilitate its fortunes.

A corporation is under no obligation at the signs of distress to seek the haven of a bankruptcy or reorganization court. Certainly, if in good faith, the directors believe that either by action of their own or through external factors, the corporation can weather the storm, then continuing the business cannot per se be condemned, even though its fortunes at the time are at a pretty low ebb. Other consequences may pertain but not the fact inference which plaintiffs ask the Court to draw from the fact itself.

2. Representations to counsel for Bondholders Committee.

In 1934, counsel for a committee of Central States' debenture holders inquired into Central States' affairs and Williams' association with it. At this time the market value of the debentures was below underlying asset value and the committee considered the possibility of a reorganization which would give debenture holders the full asset value on distribution. Accordingly, the committee's counsel conferred with John Foster Dulles, Central States' attorney, who wrote to the committee's counsel that "Williams has never, so far as I am aware, during the years I have been associated with the situation, had any personal dealings with the company." Plaintiffs charge that this statement was designed to conceal the true relations between Williams and Central States and prevented the institution of appropriate proceedings.

While the Court finds that the Central States' counsel did know of transactions to which Williams or his wholly owned companies and Central States were parties, it accepts his explanation that the statement was merely an expression of opinion, a kind of lawyer's conclusion, that there was no transaction of a personal nature where Williams had profited at Central States' expense; that the letter was written, in

29. Bankruptcy Act, Chapter X, Section 130(1), 11 U.S.C.A. § 530(1).

response to an informal request from counsel to the committee, as a summary of their discussions during which they had referred to transactions in which Williams participated. Moreover, the letter itself mentions transaction "J," which involved both Williams and Central States.

3. The investigation of the Stockholder's claim in 1939.

In 1938, a stockholder's action was instituted against Central States based upon Central States' purchases of its own convertible preferred stock referred to in transaction "D." Central States' attorney prepared an opinion for the corporation, expressing the view that it had no cause of action against Williams, the directors, or New Empire and recommended that no action be commenced against them. Central States' President informed the attorney for these stockholders of the opinion. The plaintiffs contend that the attorney's opinion was a sham, and that the defendants failed to reveal essential facts to the complaining stockholder.

There is no evidence in the record impugning the good faith of the attorney. Of course, if Central States' officers and directors had withheld information from him, there might be reason to find that there was concealment as charged by plaintiffs. However, there is no evidence as to the extent of the information furnished to the attorney. It is in any event doubtful whether a counsel's opinion can under the circumstances support a charge of concealment. It was known to the stockholders' counsel that the opinion was prepared by company counsel and that his opinion involved judgments as to applicable law with respect to a good part of which wide difference of opinion could exist. Indeed, this opinion of mine based on an extensive record and a lengthy trial which followed years of investigation and preparation, demonstrates that with respect to the transaction there could have been differences of opinion as to Williams' liability.

4. Destruction of Records.

In 1936, when investigation by the SEC was imminent, material, consisting of statistical and accounting files, reports and studies of other corporations, which might be considered harmful was removed from its files. Among these papers were memoranda from Williams.

Beginning in 1938, standing orders were issued to remove from the files all references to Williams. The employees charged with this job were told that these directions related to legal troubles and that the matter was "hush-hush." These standing orders continued through subsequent years. In 1942, at the direction of defendant McCornack, corporate papers were removed from a storage vault and delivered to his home and later destroyed by him.

Defendants claim that the removal and destruction of the records was simply a periodic pruning of old files, but the specific and repeated instructions to remove all files relating to Williams point to a conclusion that an attempt was made to conceal Williams' activity with the corporation. While there is no proof in the record of the precise contents of any of the destroyed records and no inference has been drawn to supply proof as to specific transactions, a permissible inference is that some of the papers evidenced Williams' relations with Central States and references to matters under attack.

Except for the matter of the destruction of records, the plaintiffs have failed to sustain the burden of their contentions with respect to the other items referred to in transaction "M." However, without regard to the items alleged under the "M" transaction, the Court has already found that Williams dominated Central States in all its affairs and operations. The significance of Williams' continued domination with respect to the running of the statute of limitations will be considered in the discussion of that issue.

Statute of Limitations

I

Plaintiffs' right to recover under transactions "B," "C," "I," and "L" is subject to the defense that the claims were barred under applicable New York law before February 27th, 1942, the date when the

petition in reorganization was approved in the District Court of Virginia and in any event were barred by Section 11 sub. e of the Bankruptcy Act[30] on July 5th, 1945, when the present action was commenced.[31]

At the threshold of inquiry it would be well to define the basis of jurisdiction and the nature of this action. Federal jurisdiction in this case does not rest on diversity of citizenship—it is based on Section 2 of the Bankruptcy Act.[32] The Supreme Court has held that this section established "the jurisdiction of federal courts to hear plenary suits brought by a reorganization trustee, even though diversity or other usual ground for federal jurisdiction is lacking." Williams v. Austrian, 331 U.S. 642, 658, 67 S.Ct. 1443, 1451, 91 L.Ed. 1718.

The nature of this action has been described by the Supreme Court as one "in equity for an accounting based on a charge that affairs of a state-created corporation had been conducted by the officers in violation of state law * * *" calling "for a determination of no law question except those arising under state laws." [33]

The defendants contend that since the causes of action are based on state-created rights, this Court sits as a state court and must on the authority of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, apply the New York statute of limitations under which these claims were barred long prior to the filing of the petition in reorganization, and that the intervention of the bankruptcy reorganization could not, and did not, revive them.

The plaintiffs argue that the claims are not barred because this Court is not compelled to apply state statutes of limitations as if it were sitting as a state court under Erie and Guaranty; that a federal equity court exercising jurisdiction independent of diversity, when applying statutes of limitations, whether federal or state, is not bound by a strict application of those statutes but where special circumstances exist, may, and in this case should, apply its traditional equitable doctrine of *laches* in determining the staleness of the claims.

The basic question is whether Erie R. Co. v. Tompkins controls in an equity suit involving state created rights where federal jurisdiction is based, not on diversity of citizenship but upon a statute enacted by Congress under its constitutional power "* * * To establish * * * uniform Laws on the subject of Bankruptcies throughout the United States".[34]

The role of a federal equity court with respect to state statutes of limitations was defined in Guaranty Trust Co. v. York, supra, and Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 584, 90 L.Ed. 743. Under the rule of Guaranty, a federal court in an equity action dealing with state-created rights, where jurisdiction is based upon diversity, must apply state statutes of limitations in the same manner as a state court. After the Guaranty case the Supreme Court decided Holmberg v. Armbrecht, supra, a non-diversity case, in which creditors brought an action in equity to enforce liability imposed by the Federal Farm Loan Act, 12 U.S.C.A. § 812, on shareholders of a joint stock land bank. The Supreme Court noted that Guaranty "concerned solely * * * State-created rights", whereas the Holmberg case involved "a federally-created right * * * for which the sole remedy is in equity"; and held that the federal equity court need not mechanically follow state limitations statutes. Since there was no applicable federal statute of limitations the Court adopted the local statute but superimposed federal equitable doctrines upon it.

In neither Guaranty nor Holmberg did the Supreme Court hold flatly that Erie R.

---

30. 11 U.S.C.A. § 29, sub. e.

31. Motions based upon this defense were denied without prejudice to renewal before the Trial Judge. Austrian v. Williams, D.C., 80 F.Supp. 437.

32. 11 U.S.C.A. § 11.

33. National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 598, 69 S. Ct. 1173, 1181, 93 L.Ed. 1556, wherein this case is discussed.

34. Article 1, Section 8.

Co. v. Tompkins was confined to diversity cases. In both cases, however, the Court carefully pointed to the two elements: (1) state-created rights *and* (2) diversity. The Guaranty opinion is replete with statements that both must be present.[35] And in Holmberg v. Armbrecht, supra, 327 U.S. at page 394, 66 S.Ct. at page 583, the Court restated the rule in the same confined terms: "In Guaranty Trust Co. v. York, supra, we ruled that when a State statute bars recovery of a suit in a State court on a State-created right, it likewise bars recovery of such a suit on the equity side of a federal court brought there merely because it was 'between citizens of different States' * * *."

The Supreme Court has never extended Erie R. Co. v. Tompkins beyond diversity cases and in one instance expressly refrained from considering the question. In D'Oench, Duhme & Co. v. F. D. I. C., 315 U.S. 447, 456, 62 S.Ct. .676, 679, 86 L.Ed. 956, the Court was urged to extend to non-diversity cases the rule of Klaxon Co. v. Stentor, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (that a federal court in a diversity case must follow the local conflict of laws rules), but by-passed the issue

on the ground that it "need not decide" it since the case involved the determination of a "federal not a state question".[36]

Thus, it is clear that at least up to the present, Erie R. Co. v. Tompkins has been restricted to cases where jurisdiction is grounded on diversity. Impressive argument may be summoned for its extension,[37] particularly where, as here, the claims are "rested solely on state law."[38]

But more persuasive counter argument may be made that a federal court of equity should not be required rigidly to follow state law where jurisdiction has been established by Congress under the exercise of its constitutional authority over the regulation of bankruptcies. There are substantial reasons why recovery of assets of an estate should not be hampered by the variances of limitations statutes of "each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes."[39]

The uniform and efficient enforcement of rights of debtor-estates and creditors is a matter of important federal public policy. Congress appears to have been specifically concerned with exposing corporate abuses by management groups and with conferring

---

35. "* * * a federal court adjudicating a state-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State * * *." 326 U.S. at page 108, 65 S.Ct. at page 1469.

"* * * the intent [of Erie] was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, * * * as it would be if tried in a State court" 326 U.S. at page 109, 65 S.Ct. at page 1470.

"Erie R. Co. v. Tompkins has been applied with an eye alert to essentials in avoiding disregard of State law in diversity cases in the federal courts" 326 U. S. at page 110, 65 S.Ct. at page 1470.

36. Mr. Justice Jackson in a concurring opinion pointedly noted that the Erie and Klaxon cases "dealt only with the very special problems arising in diversity cases" and that the Court had not extended the Erie R. Co. v. Tompkins doctrine beyond diversity cases 315 U.S. at pages 466, 467, 62 S.Ct. at page 683.

37. See State Law in the Federal Courts; The Brooding Omnipresence of Erie v. Tompkins, Circuit Judge Charles E. Clark, 55 Yale Law Journal 265, 280–281.

38. National Mutual Ins. Co. v. Tidewater Transfer Co., supra, 337 U.S. at page 597, 69 S.Ct. at page 1180.

39. See concurring opinion of Mr. Justice Jackson. D'Oench, Duhme & Co. v. F. D. I. C., supra, 315 U.S. at page 472, 62 S.Ct. at page 686.

The possibility of varying statutes of limitations was recognized by the Fourth Circuit Court of Appeals in this case when it directed a further investigation by disinterested trustees. "As the suggested causes of action are transitory in character, it is entirely possible that jurisdiction might be acquired over the prospective defendants in a jurisdiction where the statutes of limitations would be no defense to them; and suit might be brought in a federal court of equity, where, to say the least, it is extremely doubtful that the statutes would be followed." Committee for Holders, etc. v. Kent, supra, 143 F.2d at page 687.

upon a trustee broad investigative powers and duties "which not only contemplated the discovery of wrongs * * * by its former management, but also insured the 'prosecution of all causes of action' which might add to the assets of corporations in reorganization.'" [40]

Strong policy reasons suggest the importance of uniformity where nation-wide federal jurisdiction has been conferred on reorganization trustees in actions against multiple defendants on the same cause of action.[41]

The question is whether the "policy of uniformity within the federal system must give way to the policy of uniformity between the federal court and the courts of the state in which it sits." [42] The emphasis placed by the Supreme Court upon the diversity aspect of the Erie rule readily distinguishes it from this case, where it is far from clear that this Court is serving as "only another court of the state." The Court's jurisdiction in this case is based upon an act of Congress enacted in the exercise of its exclusive power relating to uniform bankruptcy administration.

Based upon these considerations and in the absence of controlling authority to the contrary, the Court in this case deems itself free of the restraint of Erie R. Co. v. Tompkins. In determining the staleness of claims, the Court is not bound to adopt mechanically the New York statute of limitations but may apply the doctrine of *laches* and other equity doctrines which are so firmly imbedded in "the federal court's historic equity jurisdiction". [43]

As a general rule, and even when not required to do so under Erie v. Tompkins, federal courts of equity will when "consonant with equitable principles" adopt as their own a local statute of limitations applicable to similar equitable causes of action. Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 531, 84 L.Ed. 754.

However as Mr. Justice Stone significantly pointed out in summarizing the principles:

"* * * federal courts of equity have not always held themselves bound to follow local statutes which, in ordinary circumstances, they could adopt and apply by analogy. In each case the refusal has been placed upon the ground of special equitable doctrines, making it inequitable to apply the statute. * * * Federal courts of equity have not considered themselves obligated to apply local statutes of limitations when they conflict with equitable principles, as where they apply, irrespective of the plaintiff's ignorance of his rights because of the fraud or inequitable conduct of the defendant."[44]

One of these "equitable principles," and a traditional federal equity doctrine, is, as stated in Bailey v. Glover, 21 Wall. 342, 348, 22 L.Ed. 636, "that where the party injured by the fraud remains in ignorance of it without any fault or want of diligence on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."

The statute is tolled even though there are no affirmative acts of concealment by the defendant. It is made unmistakably clear by the Bailey v. Glover opinion and is underscored by Chief Judge Learned Hand in Dabney v. Levy, 2 Cir., 191 F.2d 201, certiorari denied 342 U.S. 887, 72 S. Ct. 177, that the fraud which can serve to suspend the operation of applicable statutes of limitations does not require the elements of common law deceit. Comparing the two cases Judge Hand said: "Each action was

40. Williams v. Austrian, supra, 331 U.S. at page 657, 67 S.Ct. at page 1450.

41. It has already been noted that a number of directors of those originally named herein as defendants are not joined in the suit for lack of personal jurisdiction. See footnote 6.

42. Fielding v. Allen, 2 Cir., 181 F.2d 163, 167, certiorari denied Ogden Corp. v. Fielding, 340 U.S. 817, 71 S.Ct. 46, 95 L. Ed. 600.

43. Fielding v. Allen, supra, 181 F.2d at page 168.

44. Russell v. Todd, footnote, 309 U.S. at pages 288–289, 60 S.Ct. at page 531.

by an assignee, or trustee, in bankruptcy; each was assumed to be barred under the state law; each was to recover money which had belonged to the bankrupt and which the defendant had converted; in each the defendant had done nothing to cover up his guilt; in each the assignee, or trustee, had failed to discover the transfer within the period of limitation; and in each there had been no lack of diligence on his part in failing to do so." Dabney v. Levy, 191 F.2d at page 205.

The doctrine of Bailey v. Glover received emphatic endorsement in the Holmberg case. The cause of action under the Federal Farm Loan Act involved in the Holmberg case had accrued in 1932. Suit was not commenced until 1943 in the Southern District of New York, the plaintiff alleging that the defendant had concealed his ownership of the bank shares under an assumed name and that his identity had not become known until 1942. The defense of the ten-year statute of limitations under New York law was overruled.

Specifically referring to the doctrine of the Bailey case, the Court said that "This equitable doctrine is read into every federal statute of limitation. If the Federal Farm Loan Act had an explicit statute of limitation for bringing suit * * * the time would not have begun to run until after petitioners had discovered, or had failed in reasonable diligence to discover, the alleged deception * * *."[45]

■ Another doctrine of equity especially applicable to this case, enunciated in Michelsen v. Penney, 2 Cir., 135 F.2d 409, is that a limitations "statute is tolled while a [corporation] continues under the domination of the wrongdoers." 135 F.2d at page 415.

When a corporation is dominated by wrongdoers, knowledge of their acts and conduct involving a breach of duty cannot be imputed to the corporation until the domination ends. Generally, an accompanying result of the domination is the concealment of the underlying facts of the vulnerable transactions. This is the very conduct denounced in Bailey v. Glover,

supra, 21 Wall. at page 349, "To hold that * * * by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure." Any other rule would mean that recreant directors and fiduciaries could immunize themselves against liability by continuing wrongful conduct.

The Court concludes that the timeliness of the suit is to be determined by the federal equitable doctrines enunciated in the Bailey v. Glover, Michelsen v. Penney and Dabney v. Levy cases, supra. Do the facts warrant the application of the Court's equitable powers in mitigation of the strict mandate of the New York statute as to the running of time?

■ Transactions "B," "C," "I," and "L" have been found to have been unfair to Central States and the result of Williams' overreaching the corporation in violation of his fiduciary duty by wrongful domination and control of a subservient Board of Directors. The interdicted acts occurred in 1927 and 1929. Under New York law, all causes of action thereon would have been barred either within ten years or six years—in any event, long prior to the commencement of the action in July 1945. But Williams' domination continued until February 1942, when the petition was filed.

The complexion of the Board changed substantially by the end of 1934. Of the principal defendant-directors, only Kilmarx remained. Twelve new directors were elected to the Board during the period from 1934 to 1942 when the reorganization petition was filed. Of these, two were elected less than four months before the petition was filed. Of the remaining ten, eight were employees of Central States or American Cities, a wholly-controlled subsidiary; the ninth, an employee of Blue Ridge, the control of which was in 1938 acquired by Central States as a result of the "E" transaction; the tenth was employed by North American. Thus, a great majority were

---

45. Holmberg v. Armbrecht, supra, 327 U.S. at page 397, 66 S.Ct. at page 585.

employees of Central States, which Williams dominated and controlled, or of other corporations over which, through Central States, he exercised a dominating influence.

The new Board was as much under Williams' domination as the old one, the members of which had participated in, and permitted, the transactions here condemned. The new Board, just as the old Board, was one in name only and like the old Board supinely yielded its powers and duties to Williams. It could not be expected that the old Board would assert the corporate rights based upon their own breach of fiduciary duty. So, too, it could not be expected that those who, after 1934, from time to time composed the Board of Directors, and were likewise under Williams' domination, although themselves not participants in the condemned transactions, would assert Central States' rights either against him or their predecessors in office.

Williams' domination during the entire period of the transactions and up to February 1942, was so pervasive that it effectively prevented the proper institution of actions against him and the directors liable with him. The nature and extent of the domination was such as effectively to conceal by its very existence the significant facts of the transactions under attack. While there is reference to the transactions in the minute books and in the stockholders' reports, the underlying and basic facts upon which the claims rest were not, and are not, apparent from these records. The exercise of ordinary diligence by stockholders would not have exposed them. Only a thorough-going investigation of events which preceded, and were contemporaneous with, the transactions, most of them unrecorded, would have revealed the wrongdoing. The essential facts of the transactions remained undiscovered until sometime after his domination ceased —they were not fully revealed until after November 1944 when plaintiff Austrian was appointed as a disinterested expert. He acted promptly and vigorously commencing this suit by authority of the Virginia District Court on July 5th, 1945, some eight months after his appointment.

There is in this case also the additional element of the destruction of records, from which the inference is justified that the destroyed or removed papers contained some evidence of material facts bearing on the transactions which Williams and other directors sought to suppress.

The evidence of domination or concealment is sufficient to justify the tolling of the statute until the concealment was discovered or there was a failure in reasonable diligence to discover it or the domination ended. Williams' domination ceased on February 23rd, 1942. The trustees were appointed on February 27th, 1942. I hold that the running of the statute was suspended during Williams' domination, and that any applicable period of limitations commenced to run at the earliest on February 27th, 1942.

In determining whether the suit was thereafter timely commenced, consideration must be given to Section 11, sub. e of the Bankruptcy Act, 11 U.S.C.A. § 29, sub. e, which provides that a trustee "may, within two years subsequent to the date of adjudication or within such further period of time as the Federal or State law may permit, institute proceedings in behalf of the estate upon any claim against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy."

This gives a trustee two years from the date of adjudication within which to institute suits on behalf of the estate even though the applicable statutes of limitation, federal or state, might have expired within that period. If under the applicable federal or state law there is additional time extending beyond the two-year period, then he has the additional time. 1 Collier on Bankruptcy, 1187; McBride v. Farrington, D.C., 60 F.Supp. 92 affirmed 9 Cir., 156 F.2d 971; MacLeod v. Kapp, D.C., 81 F.Supp. 512.

The date of adjudication was February 27th, 1942, the day when the petition was approved. 11 U.S.C.A. § 502. The action was not instituted until July 5th, 1945, more than two years after adjudication.

Thus, the issue is presented as to whether the action was instituted "within such further period of time as the Federal or State law may permit."

The defendants contend that transactions "B," "C," "I," and "L," which occurred in 1927 and 1929, are subject to the then six-year provision of Section 48(3) of the New York Civil Practice Act, for injury to corporate property and the plaintiffs contend that the ten-year provision of Section 53 controls. Since limitation is to be measured from February 27th, 1942 at the earliest, it is immaterial which of these provisions governs. Even under the six-year period, the claims were not barred until February 27th, 1948, almost three years after this action was instituted on July 5th, 1945.[46] Thus, the suit was commenced within "such further period of time as the Federal or State law may permit."

With reference to Section 11, sub. e the defendants further argue that the causes of action are not claims "against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy" since under New York law the claims had been barred sometime before the filing of the petition and they may not be revived in favor of the trustees who succeeded to the claims of the estate.

Although the rule of New York State on the doctrine of tolling the statute of limitations by reason of domination may for some time not have been altogether clear,[47] it would appear that under a recent decision of the New York Court of Appeals the claims herein would have been barred before the date of adjudication.[48]

The Court has already concluded that Erie R. Co. v. Tompkins does not require it to apply mechanically the state statute of limitations and is free to apply the doctrine of laches.

Section 11, sub. e is a federal statute of limitations and so Bailey v. Glover is read into it. The doctrine of Bailey v. Glover and successor cases attaches itself to, and becomes part of, every federal statute of limitations applied by federal courts of equity. The references to "federal or state" law should be interpreted consistently with the interpretation which federal courts of equity traditionally have given to state or federal statutes of limitations in those cases where they apply equitable principles. Thus read, the reference to "federal or state" limitations, appearing in both clauses, must be construed in the light of the equitable principles which a federal court of equity considers as part of its historic power.

Any other interpretation would lead to an anomalous and inconsistent result. It would mean that in instances under Section 11, sub. e where a federal statute of limitations is applicable, the Court, where mitigating circumstances exist, would apply federal equity doctrine. But where a state limitations law is being applied, notwithstanding the same mitigating circumstances, the Court would be concluded by the strict letter of the state law, unaffected by federal equity doctrines.

Since Congress conferred jurisdiction upon all district courts to hear plenary

---

46. As to transaction "E," which occurred in 1938, the defendants contend that a three-year limitation applies by reason of an amendment to the New York State Law, Chapter 558, L.1936, Civil Practice Act, § 49(7). If correct, this means the expiration date as to that cause of action was February 27th, 1945, four months prior to the commencement of this suit and more than two years after adjudication. However, the plaintiffs contend that the two-year period was further tolled by reason of the conduct of their predecessor trustees and that time did not begin to run until Austrian's appointment on November 15th, 1944. The two-year period, they argue, under Section 11, sub. e did not expire until November 15th, 1946 and therefore the action was timely. However, the judgment in favor of defendants upon the merits in connection with transaction "E" makes it unnecessary to consider these respective contentions.

47. Michelsen v. Penney, 2 Cir., 135 F.2d 409, 416, see footnote 2, citing New York cases.

48. Zwerdling v. Bent, 291 N.Y. 654, 51 N.E.2d 933.

suits by reorganization trustees for the recovery of assets and prosecution of claims, it would seem inconsistent with the Congressional purpose to conclude that Congress intended, in the prosecution of such suits to proscribe existing federal equitable doctrines in determining limitations questions. Indeed, the presumption is to the contrary. "When Congress passed the act in. question the rule of Bailey v. Glover was the established doctrine of this court. It was presumably enacted with the ruling of that case in mind." Exploration Co. v. United States, 247 U.S. 435, 449, 38 S.Ct. 571, 574, 62 L.Ed. 1200.

The effect of the tolling of the statute results in the claims having been alive on the date of the filing of the petition.

■■■ There remains for consideration the effect of this ruling on those defendants, who, except for the defense of limitations have been held liable. The defendants Freeman, Fogarty and Stone resigned from the Board of Directors in 1934, and since then have had no connection with Central States or with the reorganization proceeding. In no respect has it been shown that after they resigned they aided Williams to continue his hold on Central States. Plaintiffs seek to hold them on the theory that they conspired with Williams in the original transactions, and so must take the consequences of his subsequent conduct and continued domination. They further argue that once a conspiracy is established the act of one conspirator is the act of all, and that to be relieved of future acts there must be positive withdrawal. But the charges of conspiracy have not been sustained and the statute may not be tolled on the theory advanced. These defendants became "strangers to the corporation" after 1934 and the period of limitations began to run in their favor at that time. Curtis, Receiver v. Connly, 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222. Recovery against the defendants Freeman, Fogarty and Stone is barred by limitations.

As to Kilmarx and Williams, the remaining defendants who have been found liable: Williams' domination continued up to the time of the filing of the petition in reorganization, and Kilmarx remained a director throughout the entire period of continued domination, and acquiesced and participated in the wrongful conduct of Williams.

The plaintiffs' right in this suit to recover on transactions "B," "C," "I," and "L" against Williams and Kilmarx is not defeated by any applicable limitations, state or federal.

The remaining defendants in transactions "B," "C," "I," and "L" and all the defendants in the remaining transactions are entitled to judgment dismissing the complaint upon the merits.

The foregoing shall constitute the Court's findings of facts and conclusions of law. In the event any of the parties desire further findings these may be proposed within ten days from the date hereof upon. five days notice.

A decree may be entered accordingly.

### Supplemental Opinion

The Court in its opinion allowed interest on all sums awarded. Upon settlement of the decree, the defendants request the elimination of interest, or, in the event that it is allowed, that it be fixed at less than 6%. The plaintiffs contend that the Court is without discretion in the matter. Finally, assuming arguendo that it does have the power either to omit or reduce the rate, they urge that the facts of the case do not warrant the granting of the relief requested.

■■■ The Court is of the view that the equities of the case require the payment of interest and that the "general and better considered rule" to allow interest should be followed. Michelsen v. Penney, 2 Cir., 135 F.2d 409, 435.

The question then remains only as to the rate. The plaintiffs contend that Section 370 of the New York General Business Law, McK. Consol. Laws, c. 20, and Section 480 of the New York Civil Practice Act make it mandatory that it be at 6%.

■■■ In this equity case the Court does not consider itself compelled to apply the rate specified in the New York statute. Undoubtedly, the better practice in the vast majority of cases is to apply the local rate, and while the Court is loath to depart from

this practice, there are special and unusual circumstances in the instant case which permit a variation. Interest is allowed as a means of compensation for loss of use of money.[1] It is a measure of the damages for the delay in payment.[2]

The interest awards in this case extend in one transaction from 1927, and in three others from 1929, to date. In that quarter of a century our national economy has undergone cataclysmic changes, which affected our entire economic structure. Wages, prices, profits and investments felt the impact. During that time the rate of interest fixed by the New York statute, incidentally, passed in 1876,[3] became unrealistic and bore no reasonable relationship to the rates of interest on private debts or the yield on Government, high-grade corporate, utilities and industrial bonds. With few and slight exceptions, the yield steadily declined from approximately 5% in 1929 on industrials to approximately 2½% in 1950.[4]

From 1929 to 1951, the average rate of return on common stocks was 5.08%, calculated on actual dividends paid by 200 representative companies, including industrials, utilities, railroads, banks and insurance companies.[5] The rate of interest on gross debts in the United States declined from approximately 4% in 1929 to slightly over 2% at the end of 1947.[6]

No attempt here is made to reach a precise amount of interest. In the Court's view, 4% more realistically reflects the overall rate of interest on private debts or the yield on investments during the period in question and is more consonant with an equitable and fair result.

That the state of the money market is a factor which may be considered is evident from the opinion of Chief Judge Parker in Chesapeake & Ohio Ry. Co. v. Elk Refining Co., 4 Cir., 1950, 186 F.2d 30, where 3%, instead of the legal rate of 6%, was allowed for the period prior to entry of judgment to compensate for delay in the recovery of damages. In approving the lower rate, the Court held: "We do not think, however, that plaintiffs are entitled to the legal rate of interest provided by statute but merely such as will compensate them for the delay in recovering damages when consideration is given to the state of the money market at the time." Chesapeake & Ohio Ry. Co. v. Elk Refining Co., supra, 186 F.2d at page 35.

In United States v. United Drill & Tool Corp., 87 U.S.App.D.C. 236, 183 F.2d 998, also decided in 1950, the Court of Appeals for the District of Columbia, in an action brought by the Government under the Renegotiation Act, referred to 6% as "a relatively high rate of interest." The District Court fixed 4%, although the prevailing interest rate in the district where the action was brought was 6%. The Court of Appeals held that the District Court was not bound to follow the local statute. It then took notice of a further Government contention, as follows: "The Government also contends that it is entitled to exact a relatively high rate of interest as a coercive measure to force speedy payment of the excess profits determined under the Act. But this argument overlooks the nature of interest which is compensatory rather than punitive or coercive. We cannot change interest from a means of compensation to a coercive or punitive measure, as the Gov-

---

1. Young v. Godbe, 15 Wall. 562, 82 U.S. 562, 565, 21 L.Ed. 250.

2. Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361.

3. Parenthetically, it is observed that in 1939 the rate of interest payable by the State and municipal corporations on judgments and accrued claims was reduced to 4%. Laws of 1939, Chapters 586 and 594. McKinney's Consolidated Laws of New York, cc. 56, 24, State Finance Law, § 16, and General Municipal Law, § 3-a.

4. Treasury Bulletin, United States Treasury Department, January, 1952; Standard & Poors, "Trade & Securities Statistics," tables, high-grade corporate, utilities and industrial bonds, pp. 124, 125, 126.

5. Calculated by Moody's Statistical Service, published in the "Survey of Current Business," issued by the United States Department of Commerce.

6. "Money Market Primer," Madden, Nadler & Heller, Ronald Press.

ernment urges us to do, unless the statute so provides." United States v. United Drill & Tool Corp., supra, 183 F.2d at page 1001.

The foregoing cases, while not directly in point, indicate recognition of the somewhat unrealistic nature of statutory legal rates of interest.

In making the disposition indicated herein, the Court does so, not on the basis of any equity existing in favor of the defendants in the case proper, but solely on the basis of economic factors during the period in question which warrant the exercise of its discretionary power in order to reach a fair and just result. The rate, of course, shall also apply to such sums which may be payable by the plaintiffs to the defendants upon dividends and other items under the "B" transaction.

The disposition herein is based upon known factors from September 1929 to date. With respect to interest from the date hereof, the Court may not indulge in predictions as to the future course of the money market and its relationship to the statutory rate. Accordingly, interest from the date of entry of the decree shall be at 6%. See 28 U.S.C. § 1961.